THE STATE OF RHODE ISLAND · PROVIDENCE PLANTATIONS, COMPLAINANTS v. THE COMMONWEALTH OF MASSACHUSETTS, DEFENDANT.

The Supreme Court has jurisdiction of a bill filed by the state of Rhode Island against the state of Massachusetts, to ascertain and establish the northern boundary between the states, that the rights of sovereignty and jurisdiction be restored and confirmed to the plaintiffs; and they be quieted in the enjoyment thereof, and their title; and for other and further relief.

Jurisdiction is the power to hear and determine the subject matter in controversy between parties to a suit; to adjudicate or exercise any judicial power over them.

An objection to jurisdiction, on the ground of exemption from the process of the court in which the suit is brought, or the manner in which a defendant is brought into it, is waived by appearance and pleading to issue; but when the objection goes to the power of the court over the parties, or the subject matter, the defendant need not, for he cannot give the plaintiff a better writ, or bill.

The Supreme Court is one of limited and special original jurisdiction. Its action must be confined to the particular cases, controversies, and parties over which the constitution and laws have authorized it to act; any proceeding without the limits prescribed is coram non judice, and its action a nullity. And whether the want or excess of power is objected by a party, or is apparent to the Court, it must surcease its action, or proceed extra-judicially.

The several states of the United States, in their highest sovereign capacity, in the convention of the people thereof, on whom, by the revolution, the prerogative of the crown and the transcendent power of parliament devolved, in a plenitude unimpaired by any act, and controllable by no authority, adopted the constitution; by which they respectively made to the United States a grant of judicial power over controversies between two, or more states. By the constitution, it was ordained that this judicial power, in cases where a state was a party, should be exercised by the Supreme Court, as one of original jurisdiction. The states waived their exemption from judicial power, as sovereigns by original and inherent right, by their own grant of its exercise over themselves in such cases; but which they would not grant to any inferior tribunal. By this grant, this Court has acquired jurisdiction over the parties in this cause, by their own consent and delegated authority, as their agent for executing the judicial power of the United States in the cases specified. Massachusetts has appeared, submitted to the process in her legislative capacity; and plead in bar of the plaintiff's action certain matters on which the judgment of the Court is asked. All doubts as to jurisdiction over the parties are thus at rest, as well by the grant of power by the people, as the submission of the legislature to the process; and calling on the Court to exercise its jurisdiction on the case presented by the bill, plea, and answer.

Although the constitution does not in terms extend the judicial power to all controversies between two or more states; yet it in terms excludes none, whatever may be their nature or subject.

This Court, in construing the constitution as to the grants of powers to the United

[The State of Rhode Island v. The State of Massachusetts.]

States, and the restrictions upon the states, has ever held, that an exception of any particular case presupposes that those which are not excepted, are embraced within the grant or prohibition: and have laid it down as a general rule, that where no exception is made in terms, none will be made by mere implication or construction.

In the construction of the constitution we must look to the history of the times, and examine the state of things existing when it was framed and adopted, to ascertain the old law, the mischief, and the remedy.

The boundary established and fixed by compact between nations becomes conclusive upon all the subjects and citizens thereof, and binds their rights; and is to be treated, to all intents and purposes, as the true real boundary: The construction of such compact is a judicial question.

There can be but two tribunals under the constitution who can act on the boundaries of states, the legislative or the judicial power; the former is limited, in express terms, to assent or dissent where a compact or agreement is referred to them by the states; and as the latter can be exercised only by this Court when a state is a party, the power is here, or it cannot exist.

This Court exists by a direct grant from the people of their judicial power: it is exercised by their authority, as their agent, selected by themselves, for the purposes specified. The people of the states, as they respectively become parties to the constitution, gave to the judicial power of the United States, jurisdiction over themselves; controversies between states, between citizens of the same or different states, claiming lands under their conflicting grants, within disputed territory.

No court acts differently in deciding on boundary between states, than on lines between separate tracts of land. If there is uncertainty where the line is, if there is a confusion of boundaries by the nature of interlocking grants, the obliteration of marks, the intermixing of possession under different proprietors, the effects of accident, fraud, or time, or other kindred causes; it is a case appropriate to equity. An issue at law is directed, a commission of boundary awarded; or, if the court are satisfied without either, they decree what and where the boundary of a farm, a manor, province, or a state, is and shall be.

There is neither the authority of law or reason for the position, that boundary between nations or states is, in its nature, any more a political question than any other subject on which they may contend. None can be settled without war or treaty which is by political power; but, under the old and new confederacy, they could and can be settled by a court constituted by themselves, as their own substitutes, authorized to do that for states, which states alone could do before.

It has been contended that this Court cannot proceed in this cause without some process and rule of decision prescribed appropriate to the case; but no question on process can arise on these pleadings; none is now necessary, as the defendant has appeared and plead, which plea in itself makes the first point in the cause, without any additional proceeding; that is, whether the plea shall be allowed, if sufficient in law, to bar the complaint, or be overruled, as not being a bar in law. though true in fact.

This Court cannot presume that any state which holds prerogative rights for the good of its citizens, and by the constitution has agreed that those of any other state shall enjoy rights, privileges, and immunities in each as its own, do would either do wrong, or deny right to a sister state or its citizens, or refuse to submit

to those decrees of this Court, rendered pursuant to its own delegated authority; when in a monarchy, its fundamental law declares that such decree executes itself.

In the case of Olmstead, this Court expressed its opinion, that if state legislatures may annul the judgments of the courts of the United States, and the rights thereby acquired, the constitution becomes a solemn mockery, and the nation is deprived of the means of enforcing its laws by its own tribunal. So fatal a result must be deprecated by all; and the people of every state must feel a deep interest in resisting principles so destructive of the Union, and in averting consequences so fatal to themselves.

ON the 16th of March, 1832, the state of Rhode Island, by their solicitor, filed a bill against the state of Massachusetts, for the settlement of the boundary between the two states; and moved for a subpœna to be issued, according to the practice of the Court, in similar cases.

This motion was held under advisement until the following term; and a subpœna was awarded and issued on the 2d of March, 1833.

This subpœna was returned with service on the 30th July, 1833; and on the 18th January, 1834, the appearance of Mr. Webster was entered for the defendants; and, on his motion, the cause was continued with leave to plea, answer, or demur.

On the 12th January, 1835, a plea and answer was filed by Mr. Webster; and on the 22d of February, 1836, by agreement of counsel, it was ordered by the Court, that the complainant file a replication to the answer of the defendant, within six months from the last day of January term, 1836, or that the cause shall stand dismissed. The complainant filed a replication on the 18th of August, 1836; and at the same time, a "notice of intention to move the Court for leave to withdraw the replication, upon the ground that the rule requiring the same was agreed to and entered into by mistake."

The bill filed by the complainants, set forth the original charter granted on the third day of November, 1621, by King James the First, to the council at Plymouth, for planting, ruling, ordering and governing New England, in America, describing the limits and boundaries of the territory so granted. The grant or conveyance to the council at Plymouth, of the 19th of March, 1628, to Sir Henry Rosewell and others, of a certain tract of land described in the same, as "all that part of New England, in America, aforesaid, which lies and extends between a great river there, commonly called Monomack, alias Merrimac, and a certain other river, there called Charles river, being in the bottom of a certain bay, there commonly called Massachusetts, alias Mattachusetts, alias Massatusetts, bay; and, also, all and

SUPREME COURT.

singular those lands and hereditaments, whatsoever, lying within the
space of three English miles on the south part of the said Charles
river, or of any or every part thereof: and, also, all and singular the
lands and hereditaments, whatsoever, lying and being within the
space of three English miles to the southward of the southernmost
part of the said bay, called Massachusetts, alias Mattachusetts, alias
Massatusetts bay; and, also, all those lands and hereditaments, what-
soever, which lie and be within the space of three English miles to
the northward of the said river, called Monomack, alias Merrimac,
or to the northward of any and every part thereof, and all lands and
hereditaments, whatsoever, lying within the limits aforesaid, north
and south in latitude and breadth, and in length and longitude of and
within all the breadth aforesaid, throughout the main lands there,
from the Atlantic and western sea and ocean on the east part, to the
South sea on the west part." The letters patent of confirmation and
grant of Charles the First, of 4th of March, 1629, to Sir Henry Rose-
well and others, for the lands included in the charter of James the
First; and the deed of the council at Plymouth, to them by the name
of "The Governor and Company of Mattachusetts Bay in New
England," incorporated by the said letters patent.

  The bill further stated that on the 7th day of June, 1635, the
council established at Plymouth for planting a colony and governing
New England, in America, yielded up and surrendered the charter
of James the First, to Charles the First; which surrender was duly
and in form accepted. That after the granting of the letters patent,
before set forth, and prior to the granting of the letters patent
afterwards set forth in the bill to the colony of Rhode Island and
Providence Plantations, the tract of land comprised within the limits
of the state of Rhode Island and Providence Plantations, had been
colonized and settled with a considerable population by emigration,
principally from England and the colony of the Massachusetts bay;
and that the persons who had so colonized and settled the same,
were seised and possessed by purchase and consent of the Indian
natives, of certain lands, islands, rivers, harbours and roads, within
said tract. That on the 8th of July, 1663, King Charles the Second,
by letters patent, granted a charter of incorporation to William
Brenton, John Coddington and others, by the name of "The Gover-
nor and Company of the English Colony of Rhode Island and Pro-
vidence Plantations in New England, in America;" and granted and
conferred to the corporation, by the letters patent, " all that part of

[The State of Rhode Island v. The State of Massachusetts.]

our dom nions in New England, in America, containing the Nahantick and Nanhygansett, alias Narragansett, bay, and countries and parts adjacent, bounded on the west or westerly to the middle or channel of a river there, commonly called and known by the name of Pawcatuck, alias Paweawtuck, river; and so along the said river as the greater or middle stream thereof reacheth or lies up into the north country, northward unto the head thereof; and from thence, by a straight line drawn due north, until it meets with the south line of the Massachusetts colony; and on the north or northerly by the aforesaid south or southerly line of the Massachusetts colony or plantation; and extending towards the east or eastwardly three English miles, to the east and north-east of the most eastern and north-eastern parts of the aforesaid Narragansett bay, as the said bay lieth or extendeth itself from the ocean on the south or southwardly, unto the mouth of the river which runneth towards the town of Providence; and from thence along the eastwardly side or bank of the said river, (higher called by the name of Seacunck river) up to the falls called Patuckett falls, being the most westwardly line of Plymouth colony; and so from the said falls, in a straight line due north until it meet with the aforesaid line of the Massachusetts colony; and bounded on the south by the ocean. And, in particular, the lands belonging to the town of Providence, Pawtuxet, Warwick, Nisquammacock, alias Pawcatuck, and the rest upon the main land in the tract aforesaid, together with, Rhode Island, Block Island, and all the rest of the islands and banks in the Narragansett bay, and bordering upon the coast of the tract aforesaid, (Fisher Island only excepted,) together with all firm lands, soils, grounds, havens, ports, rivers, waters, fishings, mines royal, and all other mines, minerals, precious stones, quarries, woods, wood grounds, rocks, slates, and all and singular other commodities, jurisdictions, royalties, privileges, franchises, preheminences, and hereditaments, whatsoever, within the said tract, bounds, lands, and islands, aforesaid, or to them, or any of them, belonging or in anywise appertaining."

The bill proceeds to state the cancelling and vacating of the charter to " The Governor and Company of Massachusetts bay in New England," on a scire facias; and afterwards the regrant of the same territory, with other territories known by the name of the colony of Massachusetts Bay and colony of New Plymouth, the province of Maine, &c., by King William and Queen Mary, on the 7th of

[The State of Rhode Island v. The State of Massachusetts.]

October, 1691. The description of the territory then granted, so far as the same is important in this case, was the following:

"All that part of New England, in America, lying and extending from the great river commonly called Monomack, alias Merrimack, on the north part, and from three miles northward of the said river to the Atlantic or western sea or ocean on the south part, and all the lands and hereditaments, whatsoever, lying within the limits aforesaid, and extending as far as the outermost points or promontories of land called Cape Cod and Cape Malabar, north and south, and in latitude, breadth, and in length and longitude of and within all the breadth and compass aforesaid, throughout the main land there, from the said Atlantic or western sea and ocean on the east part, towards the South sea, or westward, as far as our colonies of Rhode Island, Connecticut, and the Narragansett country. And, also, all that part and portion of main land, beginning at the entrance of Piscataway harbour, and so to pass up the same into the river of Newichwannock, and through the same into the furthest head thereof, and from thence north-westward, till one hundred and twenty miles be finished, and from Piscataway harbour mouth, aforesaid, north-eastward, along the sea coast to Sagadehock, and from the period of one hundred and twenty miles, aforesaid, to cross over land to the one hundred and twenty miles before reckoned up into the land from Piscataway harbour, through Newichwannock river, and also the north half of the Isles of Shoals, together with the Isles of Capawock and Nantuckett, near Cape Cod aforesaid; and also the lands and hereditaments lying and being in the country or territory commonly called Accada or Nova Scotia; and all those lands and hereditaments lying and extending between the said country or territory of Nova Scotia and the said river of Sagadehock, or any part thereof."

The bill states, that the province of Massachusetts and the colony of Rhode Island and Providence Plantations, thus established, continued under the charters and letters patent until July 4, 1776, when with their sister colonies they became independent states. The bill alleges the dividing boundary line, under the letters patent and charter to the colony of Rhode Island and Providence Plantations and Massachusetts, to have been "a line drawn east and west three English miles south of the river called Charles river, or of any or every part thereof." That for some years after the granting of the charter to Rhode Island, the lands included in the colony adjoining Massachusetts, remained wild and uncultivated, and were of little value;

[The State of Rhode Island v. The State of Massachusetts.]

that previous to 1709, the inhabitants of Rhode Island entered on parts of the land and made improvements; and that the said northern boundary line never having been settled, defined or established, disputes and controversies arose between the inhabitants of the province of the Massachusetts Bay and of the colony of Rhode Island and Providence Plantations, and between the governments of the said province and colony, in relation to the boundary of said colony.

The bill proceeds to state, that in consequence of various disputes and controversies about the boundary between the two colonies, numerous efforts were made to adjust and settle the same; all of which, as the bill alleges, were not productive of a satisfactory result to the colony of Rhode Island and Providence Plantations; and to the state of Rhode Island, afterwards established.

These are particularly set forth in the bill; and the proceedings of the legislatures of Rhode Island and Massachusetts are given at large in the same, with the operations of the commissioners appointed and acting under the authority thereof. After stating the efforts made by the two states, both whilst colonies and after they became independent states, for the determination of the line, up to 1791: alleged to have been abortive and without success; the bill proceeds to state, "That on or about the year of our Lord one thousand seven hundred and nine, other commissioners were appointed by the said state of Rhode Island and Providence Plantations and the said state of Massachusetts, for the purpose of ascertaining and settling the said northern line of the said state of Rhode Island and Providence Plantations; that the said last mentioned commissioners respectively, continued such commissioners until the year of our Lord one thousand seven hundred and eighteen; and that the said last mentioned commissioners had several meetings, but were never able to agree upon and settle, and never did agree upon and settle, the said northern line of the said state of Rhode Island and Providence Plantations."

The bill asserts the right of Rhode Island to the territory in dispute; that Massachusetts is in possession of the same, and exercises and asserts sovereignty and jurisdiction over the same, under the pretences that the same was included in the grants or charters from the crown of England, under the mistaken belief that the line, three miles south of Charles river, (a station having been fixed by Nathaniel Woodword and Solomon Saffrey, as the point three miles south of Charles river,) actually runs where Massachusetts has assumed it to run; and alleging that the line as it is claimed, and has always been

claimed by Massachusetts, was settled and adjusted by the commissioners acting under the authority of the parties respectively.

The bill proceeds to show the errors of proceedings of the commissioners acting for the two colonies, and states, "That no mark, stake or monument at that time existed, by which the place in which said Woodword and Saffrey, were so as aforesaid alleged to have set up a stake, could then be ascertained. That the persons who executed, witnessed and consented to the said pretended agreement, did not, nor did any or either of them, go to any place where said stake was alleged to have been set up; nor did they, or any or either of them, make any survey, or cause any survey to be made, or run any line or lines, or cause any line or lines to be run, or take any other means to ascertain at what place, if any, the said stake was set up by said Woodword and Saffrey; nor whether the place in which the said stake was alleged as aforesaid to have been set up by the said Woodword and Saffrey, was in fact three English miles, and no more, south of the river called Charles river, or of any or every part thereof; nor whether the said line, alleged in said pretended agreement to have been run by the said Woodword and Saffrey, was ever in fact run by said Woodword and Saffrey; nor whether said pretended line was the true and proper boundary line between the said province of the Massachusetts Bay on the north, and the said colony of Rhode Island and Providence Plantations on the south, according to the true intent and meaning of the grants contained in the respective charters or letters patent aforesaid."

The bill asserts, that the line designated and run under the agreements, has always been resisted by Rhode Island; while a colony, and since she became a sovereign state; and that no other boundary than that asserted in the bill between Rhode Island and Massachusetts, than that defined, granted and established in and by the respective charters and letters patent aforesaid herein before set forth, according to the true and fair construction thereof, has ever been consented to, or admitted to be the true boundary line by the complainants; either while she continued under the royal government, or since she became an independent and sovereign state. The proceedings of Massachusetts are alleged to "interfere with and prevent the exercise of that jurisdiction and sovereignty which, by the law of the land and the constitution of the Union, she is entitled to exercise over the whole tract of land mentioned and described in the charter or letters patent granted to the said colony of Rhode Island and Pro-

vidence Plantations, and hereinbefore set forth, and over the citizens and inhabitants thereof, according to her claim in this her bill made."

The bill asks, that inasmuch as the complainants have no satisfactory relief on the common law side of the Court, "especially as the controversy concerns questions of jurisdiction and sovereignty," that the commonwealth of Massachusetts answer the matters set forth in the bill; and that "the northern boundary line between the complainants and the state of Massachusetts may, by the order and decree of this honourable Court, be ascertained and established; and that the rights of jurisdiction and sovereignty of the complainants to the whole tract of land, with the appurtenances mentioned, described and granted in and by the said charter or letters patent to the said colony of Rhode Island and Providence Plantations, hereinbefore set forth, and running on the north, an east and west line drawn three miles south of the waters of said Charles river, or of any or every part thereof, may be restored and confirmed to the complainants, and the complainants may be quieted in the full and free enjoyment of her jurisdiction and sovereignty over the same; and the title, jurisdiction and sovereignty of the said state of Rhode Island and Providence Plantations over the same be confirmed and established, by the decree of the Court; and that the complainants may have such other and further relief in the premises, as to 'the' Court shall seem meet and consistent with equity and good conscience."

"The Plea and Answer of the commonwealth of Massachusetts, to the bill of complaint of the state of Rhode Island," alleges, that in 1642, for the purpose of ascertaining the true southern boundary line of Massachusetts, a station or monument was erected and fixed at a point south of Charles river, taken and believed to be on the true and real boundary line of the colony of Massachusetts; which monument became and has ever since been well known and notorious, and then was and ever since has been called Woodword and Saffrey's station, on Wrentham Plains: and after the fixing of said station, and after running of the line aforesaid, and after the granting of the charter of Rhode Island, and while all the territory north of said station and line was claimed, held, and possessed, and jurisdiction over the same exercised and enjoyed by Massachusetts, as parcel of her own territory, about the year 1709, dispute and controversy having arisen between the two governments respecting the said boundary line.

VOL. XII.—4 P

persons were appointed by the government of Rhode Island and by the government of Massachusetts, to settle the misunderstanding about the line between the colonies; and what the persons appointed should agree upon, should be forever after taken and deemed to be the stated lines and bounds, so as the agreement be drawn up in writing, and indented, under their hands and seals, within six *months* as aforesaid.

That afterwards, on the 19th January, 1710, the commissioners appointed by the colonies met, and entered into an " agreement of the partition line betwixt the colony of Massachusetts and the colony of Rhode Island," by which it was declared: " That the stake set up by Nathaniel Woodword and Solomon Saffrey, skilful approved artists, in the year of our Lord one thousand six hundred and forty-two, and since that often renewed, in the latitude of forty-one degrees and fifty-five minutes, being three English miles distant southward from the southernmost part of the river called Charles river, agreeable to the letters patent for the Massachusetts province, be accompted and allowed, on both sides, the commencement of the line between the Massachusetts and the colony of Rhode Island, and to be continued betwixt the said two governments in such manner as that, after it has proceeded between the said two governments, it may pass over Connecticut river, at or near Bissell's house; as is decyphered in the plan and tract of that line, by Nathaniel Woodword and Solomon Saffrey."

By this agreement, on a presumption that there had been error in setting up the station, certain surveys had been made within the line of Massachusetts, thus ascertained, it stipulated that there should " be and remain unto the said town of Providence and inhabitants of the government of Rhode Island and Providence Plantations, a certain tract of land of one mile in breadth, to the northward of the said line of Woodword and Saffrey, as before described and platted, beginning from the great river of Pautucket, and so to proceed at the north side of the said patent line, of equal breadth, until it come to the place where Providence west line cuts the said patent line, supposed to contain five thousand acres, be the same more or less; the soil whereof shall be and remain to the town of Providence, or others, according to the disposition thereof to be made by the government of Rhode Island aforesaid. Nevertheless, to continue and remain within the jurisdiction and government of her majesty's province of the Massachusetts Bay, any thing in this agreement to the contrary thereof, or seemingly so, notwithstanding."

The agreement contained other provisions for the preservation of the line, and for the ascertaining the surveys made by the inhabitants of Providence within the same; so that they might proceed with the settlement and improvement thereof.

This agreement was executed under the hands and seals of the commissioners; and was witnessed by persons on the part of the two colonies.

The plea and answer alleges, that the whole of the real and true merits of the complainants' supposed cause of action were fully heard, tried, and determined by the judgment and agreement of the commissioners; that the same was a full settlement of all the matters in controversy, and was made in good faith; and the station so fixed and established, became matter of common notoriety, and the line capable of being always known and ascertained.

The answer and plea further states, that afterwards, on or about June 18th, 1717, to complete the settling and running the line between the two governments, the general assembly of Massachusetts passed an order appointing commissioners, to meet commissioners to be appointed by Rhode Island to run the line, according to the agreement of January 19th, 1710. Certain other proceedings on the part of Massachusetts took place, preparatory to the proceedings of the commissioners; and on the 17th June, 1717, the general assembly of the colony of Rhode Island and Providence Plantations passed an act, appointing commissioners on the part of Rhode Island, for the final settlement of the boundary line with the commissioners named and appointed by Massachusetts. On or about the 22d of October, 1718, the commissioners met, and then made an agreement, which was signed, sealed, executed, and delivered by them, by which it was stipulated and declared: "That the stake set up by Nathaniel Woodword and Solomon Saffrey, in the year one thousand six hundred and forty-two, upon Wrentham Plain, be the station or commencement to begin the line which shall divide between the two governments aforesaid, from which said stake the dividing line shall run, so as it may (at Connecticut river) be two miles and a half to the southward of a due west line, allowing the variation of the compass to be nine degrees, which said line shall forever be and remain to be the dividing line and boundary between the said governments, any former difference, controversy, claim, demand, or challenge whatsoever notwithstanding."    And on the twenty-ninth day of the said October last aforesaid, the general assembly of the said colony of

Rhode Island and Providence Plantations accepted the agreement of the said commissioners, and caused the same to be duly recorded; and thereby ratified and confirmed the same.

The answer avers that all this was done in good faith, and with a full and equal knowledge of all the circumstances by the respective parties; and that the same has never been annulled, rescinded, or abandoned; and the last agreement was in pursuance of the agreement of 1709. Afterwards, on the 14th May, 1719, the commissioners on the part of Massachusetts and Rhode Island, signed a report, return, and statement of their proceedings, under the designation of "The Subscribers, being of the committee appointed and empowered by the governments of the province of Massachusetts Bay and the colony of Rhode Island and Providence Plantations, for settling the east and west line between the said governments;" stating that they had met at the stake of Nathaniel Woodword and Solomon Saffrey, on Wrentham Plain, and had run the line, placing heaps of stones and marking trees to designate the same.

The defendant further alleges—"That the said report, return, or statement was afterwards, that is to say, on or about the sixteenth day of June, in the year of our Lord one thousand seven hundred and nineteen, approved by the general assembly of the said colony of Rhode Island and Providence Plantations;" and the defendant alleges, that from the date of the said agreements to the present time, the said commonwealth of Massachusetts has possessed and enjoyed all the territory, and exercised jurisdiction over the same, north of the said line, as prescribed in the said agreements of October, 1718, without hindrance or molestation; and the said defendant avers that both the points of beginning agreed upon by said parties to said agreement, viz: the stake or station set up by the said Woodword and Saffrey, and the line run therefrom to Connecticut river, then were, ever since have been, and still are well known and notorious; that the whole boundary line fixed on by said agreement is precise, definite, and certain; and that the said defendant has occupied and exercised jurisdiction, and enjoyed all rights of sovereignty according to the same, from the date thereof to the present time.

The defendant pleads the agreement of 19th January, 1710, and the agreement in pursuance and confirmation thereof, of 22d October, 1717; and unmolested possession under the same from their date; in bar of the whole bill of the complainants; and prays judgment accordingly.

[The State of Rhode Island v. The State of Massachusetts.]

The answer and plea further aver, that the agreements stated were made and entered into with full knowledge of all the circumstances in both parties; that the same were a valid and effectual settlement of the matters in controversy; and were made and entered into without fraud or misrepresentation: and the station settled there has been notorious, and the line run therefrom has always been known, and its marks and memorials capable of being discerned and renewed.

Mr. Webster, of counsel for the state of Massachusetts, moved to dismiss the bill filed by the state of Rhode Island, on the ground that the Court had no jurisdiction of the cause.

The motion was argued by Mr. Austin, the attorney general of the state of Massachusetts, and by Mr. Webster, on the part of the state of Massachusetts; and by Mr. Hazard and Mr. Southard, for the state of Rhode Island.

Mr. Austin, in support of the motion:

This is an action by bill on the equity side of the Court, instituted by the state of Rhode Island against the state of Massachusetts.

The bill asserts the claim of Rhode Island to jurisdiction and sovereignty over a portion of territory, therein particularly described. The territory, so described, comprises between eighty and one hundred square miles, being a part of six townships, incorporated under the laws of Massachusetts, with a population of about five thousand persons, at present citizens of that state; and not less than five hundred thousand dollars of taxable property. But the bill makes no claim to any right of soil. It does not seek to disturb the title of the present possessors of the land, whose ancestors probably derived their title from the grants of the early government, in Massachusetts. It admits that the sovereignty and jurisdiction which it seeks to acquire, now is, and always, heretofore, from the first settlement of the country, have, in point of fact, been enjoyed and possessed, first by the colony, afterwards by the province of Massachusetts, and then by the state of Massachusetts, at the declaration of American independence; at the adoption of the constitution of the United States, and uninteruptedly to the present time; but avers that the territory over which jurisdiction and sovereignty are now demanded for Rhode Island, was not included within the boundary of the ancient colony of Massachusetts, in 1642, but was contained in the

[The State of Rhode Island v. The State of Massachusetts.]

description of the limits of Rhode Island, as established by the charter of Charles the Second, made to her as a colony of Great Britain, in 1663; and by force of that charter, ought now rightfully to be enjoyed by her; but that Massachusetts wrongfully usurped jurisdiction and sovereignty over the territory thus claimed, and now possesses it, and has always possessed it without right.

The complainant therefore asks of this Court, that the northern boundary line between the complainant and the state of Massachusetts, may, by the order and decree of this honourable Court, be ascertained and established, and that the rights of jurisdiction and sovereignty of your complainant, may be restored and confirmed to the complainant; and your complainant may be quieted in the full and free enjoyment of her jurisdiction and sovereignty over the same; "and the title, jurisdiction and sovereignty of said state of Rhode Island be confirmed and established by the decree of this honourable Court, and that your complainant may have such other and further relief in the premises, as to this honourable Court shall seem meet, and consistent with equity and good conscience."

Among the allegations of the bill, it appears that a commission for the establishment of the partition line between the two colonies, was appointed by the respective local governments thereof; and that the commissioners on 19 January, 1710–11; agreed upon and established the line, as it now is, and always before had been known, possessed and established. But the complainant seeks for various causes which are in the bill enumerated, to set aside this agreement and adjudication of commissioners, as null and void.

The respondent has filed a special plea in bar, to the complainant's demand, grounded on the arbitration, award and settlement made by those commissioners; and a constant and uninterrupted possession under it for more than a century: and has answered in full all the allegations by which the complainant seeks to vacate this award. And the respondent well hoped it would have been the pleasure of Rhode Island to have discussed the merits and effect of this ancient adjudication; but when her learned counsel, under an order of this Court to answer the respondent's plea, filed a general replication, they accompanied the same with notice of an intention to move to withdraw the same; and have since intimated a desire to change and amend the tenor of the bill itself. To all this there would be no other objection but the inconvenience of delay, and the trouble

of keeping open a litigation so extensive in its operation. To bring the whole matter to a speedier issue, Massachusetts presents only a single point of her defence.

A motion is now made to dismiss the bill, for want of jurisdiction.

In establishing the government of the United States, the 3d article of the constitution, and second section, provides that the judicial power shall extend to all cases in law and equity arising under this constitution, the laws of the United States, and treaties made, or which shall be made under their authority; to all cases affecting ambassadors, other public ministers and consuls; to all cases of admiralty and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more states, &c.; in all cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be a party, the Supreme Court shall have original jurisdiction.

Whether the subject of the present suit is a controversy between states, within the meaning of the constitution; and whether, if it be so considered, a law of congress is necessary to the exercise of judicial power by this Court in the premises; and whether, if such law be necessary, any sufficient action has been had by congress to authorize judicial proceedings, are questions which, under this motion, are to be examined and decided.

In support of the motion to dismiss the bill, it is contended, that this Court has no jurisdiction over the present suit:

1. Because of the character of the respondent, independent of the nature of the suit.

2. Because of the nature of the suit, independent of the character of the respondent.

If the first of these propositions can be maintained, the result is, that in the present state of the law, this Court cannot entertain jurisdiction over a state of this Union, for any cause. If that may be doubtful, and the second proposition is established, it will result in this, that the subject matter of this suit, being for sovereignty and sovereign rights, is beyond the jurisdiction of a judicial court.

To the jurisdiction of a court of the United States in every case, two circumstances must concur. 1st, The party, or the subject of the suit, must be one to which the judicial power of the government extends, as that power is defined by the constitution; and, 2dly, There must be some rule of decision established by the supreme

power of the country, by the administration of which the right of the parties to the matter in controversy may be determined.

The government of the United States does not come by inheritance, or succession into any judicial power. In this respect, it is essentially different from all other governments known in the history of the world. Where a nation has been established by colony, or by conquest, there was a foundation in the institutions of the parent state, or the victors, on which its municipal establishments should be placed. Its own domestic arrangements, if it had any, remained, until changed by paramount authority. Such was the case with the states of this Union, when they ceased to be colonies. The government of the United States is a new government, beginning with the constitution. Although the confederation was its prototype, there was no general government, and certainly no national or federal judiciary, until the constitution had formed one.

The government of the United States may, therefore, exercise all, but no more than all the judicial power provided for it by the constitution.

The third article of that instrument contains a declaration of the existence and extent of this new power.

It ascertains the parties, the causes, and the courts for judicial action. To a certain extent, it establishes the rule of decision; and, perhaps, this particular branch of the inquiry into the jurisdiction of the Court in this case, will depend on ascertaining how far the rule of decision is carried by the constitution; because, if the party and the controversy, and the rule for deciding the merits of the controversy are, by the constitution, given to this Court; there can be no impediment to its action in this particular.

It is admitted, that by the express words of the constitution the judicial power of the United States extends to controversies between two or more states. The party, therefore, may be within the operation of the judicial power; in case such a controversy as is contemplated by the constitution exists with one or more states.

Does the term controversies extend to all controversies?

It is to be observed, that the word "all," which is prefixed to the other classes of cases, is here omitted. The judicial power extends to all cases under the laws of the United States; all cases under the treaties made, &c.; all cases affecting ambassadors, &c.; all cases of maritime and admiralty jurisdiction: but its phraseology is changed, and the universality limited by the omission of the word "all,"

when it relates to controversies to which the United States shall be a party, and to controversies between two or more states. The judicial power, then, does not reach to all possible controversies to which the United States shall be a party, or between two or more states.

What are the limitations? The first are those which are made by the character of the tribunal; and are included in the terms judicial power; and the words "law and equity," which precede the enumeration of the subject matters of judicial cognizance.

Although the government formed by the constitution, was a new government, and took nothing by succession or custom; the men who framed the constitution were educated to an intimate acquaintance with the judicial institutions of England; whose laws were, to a great degree, the foundation of our own, and whose language, when used by them in this relation, must be deemed to have a technical meaning.

A judicial power means, therefore, a power to interpret, and not to make the laws; and the terms "law and equity," have reference to that complicated code of the mother country; extensive, but not universal, and limited in its operation by well settled decisions.

A limitation, on the broad terms of the grant, is necessarily implied in other branches of this power. The judicial power extends to controversies to which the United States shall be a party, and between a state and foreign states; but it would be manifestly absurd, to bring the political disputes of the day, nullification, abolition, slavery; and the controversies which are beginning to arise between states concerning them; to the decision of a jury trial in a court of law.

It is submitted, also, that controversies between states must be limited to those which begin with the states in that capacity, and does not extend to the antiquated controversies existing between the colonies, to which the states may or may not have succeeded, according to circumstances, which a judicial court can have no means to ascertain.

But the proper mode of considering this article of the constitution, in relation to the judicial power, is to take the constitution as a whole, and keep constantly in mind the grand design and intention of its framers; always regarding it as unique, original, and consistent with itself. The grand object of its framers was to establish a common government for sovereign states, and to have that sove-

reignty unimpaired, wherever it could so be left; without impairing the government of the Union. The judicial power of the United States is a power, in this view of the case, all or any part of which the government of the United States might exercise, through the appropriate department which was to be established.

It extends to such controversies between two or more states, as are properly within the decision of law and equity, in the precise sense of those terms, arising between the states, in virtue of their relation as states; and to be proceeded with and decided according to the customary forms of judicial proceedings, and the established doctrines of known and acknowledged laws. Every state, by virtue of its sovereignty, and every citizen of every state, by virtue of his allegiance to such state, stands absolved from the jurisdiction of the judicial power of the United States; until the government of the United States, putting into operation so much of the judicial power granted by the constitution as is necessary for the purpose, has organized a court, established the rules of decision, directed the forms of its process, and designated the subjects for its cognizance; not exceeding, in any of these respects, the power assigned to it by the constitution itself.

If, therefore, there is no law regulating the intercourse between the states of the Union; there is no rule for settling a controversy that may arise between two or more states, by reason of such intercourse. I it then should be admitted that a law could be made binding the intercourse of states, and that one state might sue another state for a breach of such law; yet, until such a law exists, this Court can entertain no jurisdiction, because the state having a character above or beyond the existing law is not amenable to any superior; and the Court having no law to expound, cannot settle a judicial controversy, depending, as all such controversies do, on the question whether the conduct complained of, has, in the case presented, conformed to, or departed from the obligations which are imposed by law.

The positions then, which, to carry out this doctrine, are next to be established, are: that the jurisdiction of this Court in any particular case, depends on some adequate legislative provision for the exercise of its powers under the constitution: and secondly, that in point of fact, no law is now in force which operates judicially on a state of this Union.

A legislative provision, it is contended, is necessary for two purposes; first, to regulate the form of process from the citation to the

[The State of Rhode Island v. The State of Massachusetts.]

judgment and execution, without which last, judicial action is a mere mockery; and secondly, to establish the law of the case, or the rule of action by which the conduct of the ligitants is to be tried.

In regard to the last, which, as the most material, may be first considered, it supposed that no doubt can exist as to the necessity of such law, as a pre-requisite to judicial action. Judges are to expound the law, not to make it. The only pertinent question then is, does any existing law which this Court can recognise, act upon and regulate the intercourse between the states of this Union?

It is supposed that when a nation is established, and becomes by revolution or otherwise a member of the family of nations, it is, ipso facto, under the operation of international law. But not only does the doctrine of international law apply to the nation, and not to the states of our confederacy; but the law itself is not the subject of administration by judicial tribunals, when it operates on communities. Ambassadors are its counsellors; and its argument, the ultima ratio regum. If the principles of international law are made applicable to individuals in a judicial forum, it is because the municipal law of the place has incorporated the international law as a part of itself, and administers it by the force of domestic legislation. The constitution may itself establish a rule of decision. It does so in the case of treaties, which are declared to be the supreme law of the land; and it provides that its own provisions shall be binding on judges in all the states. Whatever difficulties might be found in a judicial administration of the constitution or a treaty, between individual litigants claiming rights under them, without the aid of a law of congress; they may all be done away without touching this case; because nothing is claimed by the constitution or any treaty of the United States to show the right of the claimant in the present case, or bind the respondent to any prescribed course of action.

The necessity of a law of congress to establish, by direct enactment, or by implication, the code of the United States, has been admitted by this Court. Martin v. Hunter, 1 Wheat. 329. And it is supposed by the Court, in giving its opinion in that case, that congress was bound to vest in its courts all the judicial power of the government.

Congress has judged differently, because it has not appropriated all the judicial power of the government. But the question here, is not whether congress is wrong in the omission, but whether, in a clear case of omission, this or any court of the United States can

[The State of Rhode Island v. The State of Massachusetts.]

supply the defect. In a very early period of the history of this Court, it was supposed that the states, like individuals, were amenable to its jurisdiction; and under that impression it was intimated in argument, and seemingly sustained by the majority of the Court, that the moment a Supreme Court is formed, it is to exercise all the judicial powers vested in it by the constitution, whether the legislature have prescribed methods for its doing so or not. Chisholme's Exr's v. The State of Georgia, 2 Dall. 419; 1 Cond. Rep. 6.

The opinion of the Court was not unanimous; and Judge Iredell's dissenting opinion has become, by the 11th article of amendment of the constitution, the better authority. It is to be observed, that this amendment does not change the text of the constitution. That remains the same. The amendment declares that the judicial power shall not be deemed to extend to a case, which, by the construction of the Court it had in the above case been made to reach. It is further to be remarked, that all the subsequent proceedings of this Court in regard to states defendants, have, as far as they have proceeded, been fastened to this case. But the case being overruled by a higher tribunal than even this august Court, in a mode perfectly legal, it is submitted that no dictum, and no principle promulgated in it, can have the authority of law.

The necessity of a code of laws for the government of judicial action being apparent, congress has attempted to establish one. This is done, so far as it is done at all, by the judiciary act of 1789.

This statute adopts, in the 34th section, the laws of the states as a rule of action where they can apply. But as no law of Massachusetts or Rhode Island can embrace the respondent in this particular matter, there is by that section no rule prescribed for the present controversy.

It has been contended that the statute aforesaid, taken in connection with the constitution itself, established a code mixed and miscellaneous, made up of the common law and equity practice of Great Britain, modified by our particular institutions, which serves as the basis of judicial action. To a certain extent, this is undoubtedly so in many, if not all the old states; but to what extent it is true in regard to the United States, has been a debatable question, and is not yet definitely settled.

It is not necessary to settle it in this case; because, if the common law and chancery law of England are in operation here, in their utmost latitude and force, they do not reach the respondent.

[The State of Rhode Island v. The State of Massachusetts.]

The common law of England takes no jurisdiction over the actions of sovereign states; nor is there any power in chancery to hold jurisdiction over a sovereign, without his consent.

Such is the character of the states, respectively, of this Union. This proposition it is not intended to discuss. No man, who has at all studied the constitution of the country, can fail to have his mind made up on this point, on the one side or the other. It is maintained by the respondent, that every American state is a qualified sovereignty, and as such exempted by common law, (meaning thereby, the whole judicial code of the country,) from judicial responsibility. It is not contended that a law may not be constitutionally made to reach a state. The question under discussion is, whether the present law extends to a state. The present law is what we term by eminence, and for distinction, the common law; and it is beyond all controversy, that the common law operates on subjects only, and not sovereigns; and upon property; and not sovereign rights.

If the constitution authorizes the government of the United States to subject a state to judicial process and judgment, the government of the United States may pass the laws necessary for the purpose. But to declare what may be done, is not to declare what is done. If congress, for any reason, has stopped short, the judicial department is at the same point brought to a stand. If it has adopted the common law, and nothing more, the Court can do no more than the common law warrants. If the common law does not extend its jurisdiction over a sovereignty, neither can the Court.

The doctrine contended for is that alone which prevents a suit against the United States by every individual who has a demand in dispute. The constitution is as unlimited in regard to the United States as the states. The judicial power extends to controversies to which the United States shall be a party. And in the earlier decisions of this Court, it is maintained that it is the same thing, as regards jurisdiction, whether the party designated be plaintiff or defendant. The state of Massachusetts, instead of soliciting congress for an adjustment of its claim, might have instituted a suit in this Court; obtained if it would a judgment, and levied its execution on a ship of the line, or the arsenals of the country.

The sovereignty of the United States, carried to its legitimate consequences, protects it from this extravagant absurdity. But

Chief Justice Jay, when, in his opinion in the Georgia case he rode over state sovereignties, admitted that the logical conclusion of his argument involved a liability on the part of the United States to a suit at law. He avoids it, however, by the extraordinary suggestion that "in all cases against states or individual citizens, the national courts are supported in all their legal and constitutional proceedings and judgments by the arm of the executive power of the United States; but in cases of actions against the United States, there is no power which the courts can call to aid:" Georgia case, 2 Dall. 478. What is this but an abandonment of duty through fear. It would have been better to adopt the maxim of the English lord chief justice: Fiat justitia, ruat cœlum. The better answer is that by the law, as it stands, no action in a judicial court can be maintained against a sovereignty, whether state or national. That the constitution has, in both cases, authorized congress so to frame and pass laws that the judicial power may operate on the one and the other; but until that is done, any action of the judiciary would not be to expound the law of the case, but to make one.

But the United States are sometimes sued. This is in cases of contract, or other similar causes of action, in which the United States, dealing as a private citizen with other citizens, consents to come into a court of justice, and submit to the operation and construction of the laws of the land. The laws of the land reach to contracts. The United States makes a contract; and when it submits, by its own consent, to a suit, admits expressly, that in the decision the law of contracts shall apply to its case. The United States makes a treaty; and, by the constitution, a treaty is the law of the land. It claims for itself land under that treaty; takes possession, and cannot be ousted by a suit at law, in virtue of its sovereignty. But it waives its sovereignty, and submits its title under the treaty, to arbitrament by commissioners, or to a judicial decision in a court of law.

Have the states consented to be sued? Unquestionably the provision of the constitution is their consent to exactly what that provision contains; but the inquiry is not of consent, but construction.

Massachusetts does not propose to take herself out of the constitution, or to withdraw from any of its obligations. She admits, that under certain circumstances she has agreed to waive her sovereignty, and submit her controversies to judicial decision; but maintains, that

before sne can be called upon to do this, a court must be established, a law made, or a code propounded, suitable to the decision of her case; and the forms of process, mode of proceeding, character of judgment, and means of enforcing it, be first established by legislative authority. But the United States never has submitted its sovereign rights, or its acts in its sovereign capacity, to judicial cognizance, and never can; and the states, as is contended, by agreement to submit their controversies to judicial decrees, never intended to include in these controversies questions of sovereign right, for the regulation of which no law is made; and no law ever can be made by any other power than themselves, and each one for itself alone.

This view of the case is greatly fortified by considering the law which the complainant desires this Court to administer. This indeed may be deemed to belong to the merits of the case; and it does so. But it is also an appropriate subject of examination under the motion now submitted. One of the grounds of this motion is, that there is no existing law of the country binding on these parties, applicable to the controversy between them, which this Court can administer. This would be exceedingly obvious, if the complainant had presented his title under the bull of Pope Nicholas V., by which he divided all the countries to be discovered from Africa to India; or under Alexander VI., in which he divided three-quarters of the habitable globe: Omnes insulas et terras firmas inventus aut inveniendus, detectas et detegendas, &c.

The claim set forth in the bill is, in the judgment of the Respondent's counsel, equally extra-judicial and untenable.

The state of Rhode Island states its claim to be thus: By the charter given to certain persons by Charles First, king of England, bearing date the 4th March, 1628, the colony of Massachusetts was established, with a territory bounded on the south by a line drawn within the space of three English miles, on the south part of the said river called Charles river, or of any or of every part thereof. That a charter was granted by Charles Second, on or about 8th July, 1663, establishing the colony of Rhode Island, by which its northern boundary was defined in these words: "on the north or northerly, by the aforesaid south or southerly line of Massachusetts Colony or Plantation." By these two charters, the boundaries of the two colonies were adjacent and conterminous.

That after the vacating of the colony charter of Massachusetts in

1684, and the granting a province charter in 1691; which, so far as this matter is concerned, established the same conterminous boundary by the same words; the government of Massachusetts, about 1719, wrongfully possessed herself of a tract of land more southerly than a true line would be drawn, which should be run three miles south of the river called Charles river, or of any and every part thereof, "and extending the whole length of the north line of the colony of Rhode Island, being more than twenty miles in length and four miles and fifty-six rods in breadth, in the east end thereof, and more than five miles in breadth at the west end thereof, and has since continued wrongfully to exercise jurisdiction over the same."

From other parts of the complainant's statement, it is apparent that the true place for the dividing line was then admitted by both parties to be that described in the charter, and that it was drawn and the territory occupied by the province of Massachusetts on a claim of right; that the place of location was the place designated in the charter. The possession of Massachusetts, per fas aut nefas, from that time, is admitted.

The title of Rhode Island to the premises, admitting she is right in the construction of the charter, and the point from which the boundary line should be drawn, (in which, at a proper time, it will be proved she is in great error,) depends on the validity of a grant by charter of the British crown, against an adverse possession of more than one hundred years; first by a province, and next by a state of the Union; through all the vicissitudes of war, revolution, and independence.

If, therefore, such a charter, admitting its existence, gives no title against an adverse possession; and especially, if the declaration of American independence, and the subsequent formation of a federal government, to be judicially noticed by this Court, have vacated the law, or supposed law, on which the claimant rests its title, and this so plainly, that the charter cannot be inquired of by the Court, but that under the constitution it is bound by events subsequent to the declaration of independence, in all that respects states, because the states were thereby created; then, even under this motion to dismiss for want of jurisdiction, the bill must be dismissed.

Such is conceived to be the case. The state of Massachusetts makes no claim for herself; and admits none for Rhode Island, by force or virtue of any grant, charter, or authority from the British crown. Whatever might have been, in ancient times, the validity

of these instruments of royal power, they ceased, at the declaration of American independence, to have any judicial operation on the great corporations or colonies they had contributed to establish. Massachusetts, when she became a state became so in the integrity of her whole territory, as it was then possessed by her, whenever or however acquired, by grant, charter, purchase, treaty, or force of arms, claiming her actual possession as the ultimate evidence of right, and denying that there then existed, or yet exists, any human tribunal that can lawfully inquire how or by what means that possession was obtained; or that any authority exists to determine the limits of an original state of the Union, in any other way than by determining what it was, de facto, on the 4th July, 1776.

So far as regards Great Britain and other foreign nations, the treaty of peace in 1783, settled the exterior boundary of the United States; but in what proportions it was owned by the thirteen sovereignties, then commencing a political existence, was to be adjusted by themselves. This adjustment was a matter of agreement then to be made, or to rest on the fact of possession; which, admitting no higher title, and capable of no higher proof, assumed the right from the exercise of the right: and it would now be as wise to inquire how the seven Saxon kingdoms of Great Britain were established, or to define the limits of the heptarchy, as to attempt to decide what constitutes a state of the American Union, beyond the fact that so it was when the nation was proclaimed independent, or the confederacy was established under the constitution

There have been many decisions in this Court affirming the original validity of British grants of land, and of government. It is not proposed to set up any principle militating with these decisions. A careful examination of each of them, will show a distinction supporting the doctrine now contended for.

Discovery or conquest are, no doubt, well recognised titles, from which to deduce, ab origine, grants of land, and political government. But these titles carry with them, by their very terms, the idea of possession. The discoverer or the conqueror, is the only person in possession; and by force of his possession so acquired, he establishes a government, marks out a territory, or conveys title to the soil. The grant is a contract which the grantor cannot vacate; but it was never doubted, although the case has never come into judgment, that it might be surrendered or abandoned by the grantee. But a corporation, and much more a colony so established by the

right of conquest or discovery, is not a private, but a public, political institution.

To maintain that it was inviolable by the crown, was the doctrine of the patriots of the revolution; but to deny to them the power of abrogating, dissolving, annihilating it, is to bastardize the revolution itself. If the revolution did any thing, it was to cancel and annul these royal charters; and the same right of conquest, by which the king of England obtained power to make a political government here, gave to the states the right to destroy it.

In the Dartmouth College case, Wheaton's Reports, the only important question was, whether the corporation then in question, was a public or private corporation. It was admitted that, in the former case, it was repealable by the state. That a colony was a public institution, and partaking the character of a corporation, is undeniable. Indeed, Massachusetts was summoned into chancery as a public corporation, in the year 1684, and judgment rendered to vacate and annul her charter. But the revolution, the declaration of independence, the formation of the constitution of the United States, are acts of higher authority than the decree of the lord chancellor. They dissolved the government of the colony, and the colony itself.

The people thereafter claimed and possessed the country by a new title. Sovereign rights were assumed by the states, in their character of public communities, claiming the right of self-government over the soil then in their actual possession; and the territory now claimed by Rhode Island, whatever it was before, then was, in fact and by possession, an integral part of Massachusetts. It was the state, as much as Boston or Salem. All other titles merged, and the charter was at an end.

Neither can the state of Rhode Island claim any thing by virtue of a charter granted to the colony of Rhode Island, by the English crown. Rhode Island, by her own act of independence, vacated that charter, and remitted herself to her better title of possession, by which she now holds the towns of Bristol, Warner, Barrington, Somerset, Little Compton, Tiverton, and the fine lands of Mount Hope and Poppy Squash; a territory almost half her actual extent, and unquestionably belonging to Massachusetts, as part of the original colony of Plymouth, which was united in one colony, Massachusetts, in 1691. Baylie's Plymouth, part 4, p. 50; Morton's Memorial, 480. For the impossibility of being governed by the charters, see

Bancroft's Hist of U. S. 83, 84, 137, 138, 209, 210, 309, 313, 364; Mass. Hist. Soc. 1st vol. 205, 412, 442, 396; 2d vol. 244.

Some questions may be proposed on this subject relating to the rights of the complainant under his assumed title, and the supposed obligations to the respondent, which must be answered before this cause can proceed to hearing and judgment.

Can a sovereign state be sued for acts done in virtue of, or by claim of right in its sovereign capacity? If Massachusetts had marched across the border supposed by Rhode Island to be the true line, and, in a belligerent attitude, taken possession of the disputed territory; is such act within the cognizance of this Court, subjecting the state to action of trespass, quare clausum fregit?

If such suit is maintainable, by what law is the action of the Court to be regulated in cases where the constitution lays down no rule of proceeding, where the subject is not within the scope of any treaty, and is not defined by any statute law of congress?

If a state may be made amenable to a judicial court, is she to be answerable for the acts of a colony to which she has succeeded?

If she is suable, has the state sued, the common rights of other defendants, to plead accord and satisfaction, arbitrament and award, title by prescription, or the bar of any statute or common law limitations?

If a state takes all the estate and appurtenances of its colony ancestor, to whom it claims to succeed, is it what such colony had in possession when it ceased to exist; or may it lay claim to every thing to which such colony had a paper title, although disseised by the intrusion of some neighbouring state or colony?

If a state claims the rights of its colony ancestor, by what rule of what law are such rights to be ascertained?

If such rights are of real estate, will such estate pass to the colony in the first instance by deed only, or by livery of seisin?

If the suit is for sovereignty or sovereign rights, is there any title to such claim but possession?

If, in the case of the South American provinces, the United States delayed to acknowledge their independence and nationality, so long as there was a contest about it, and the possession was not secured; and if such be the principle of the law of nations, is not the same doctrine to prevail whether this sovereignty is claimed for the whole territory, or for a part of the whole?

But the more significant question remains. Can the allegiance of

five thousand American citizens, natives of Massachusetts, and owing her the duties of citizens, *or of one such,* be changed by a decree of this Court; without their consent, without notice to them to agree or disagree, as if they were serfs on the soil of Russia: because one hundred and twenty years ago, the prodigal monarch of England put his signature to a piece of parchment, to gratify the avarice or the ambition of his courtiers?

The want of jurisdiction is further maintained by considerations applicable to this matter, arising both before and subsequent to the decision of the controversy on its supposed merits.

The merits of any case depends on the conformity of a party's conduct to a previously prescribed rules of law; but, if there be no such rule, there can be no test of such merit, and no decision upon them. But, in addition to this, a question arises on the form of process. By what rule of law can a state be brought before this Court, and by what form of execution, known to the laws, can the judgment of this Court be carried into effect?

It is undeniable that the power to direct the process, to declare its nature and effect, and the mode in which the judgment of the Court shall be executed, must be prescribed by the legislative department.

This may be done, possibly, by implication or reasonable inference. It is certain, no such provision is made by direct enactment. In the case of New Jersey v. New York, 3 Peters, 461, 4 Peters, 284, where this matter has been considered; it is admitted, that there is no direct provision of law, but the power to summons is made to rest on an analogy to individual suitors. That of execution is not at all considered by the Court.

Now, it is contended, that the original analogy that was supposed to exist between sovereign states and private citizens, never did exist. The 11th article of Amendments to the Constitution has so declared. Before that amendment, and under the broad extent of power erroneously assumed by this Court, a state was, indeed, but in the character of a private corporation; and it might well be thought, on that hypothesis, that the power to try a party by a known rule of law, involved the necessity of having the right to bring such party into Court for trial and judgment; and that such power, as it extended to reach other suitors, might also reach states, between whom and other suitors, as the Court construed the constitution, there was no difference. In the opinion of the dissenting

[The State of Rhode Island v. The State of Massachusetts.]

judge, there was a difference; and when the 11th amendment altered the constitution, so that, to a great extent, this difference is established, the consequence seems legitimately to follow, according to the doctrines maintained by the dissentient.

It is now true that states were once deemed mere ordinary suitors, and that the general provisions of the process act, reached states as other suitors, because there was not recognised to be any difference among them. The process act reached only ordinary suitors. States are not now ordinary suitors, and the process acts reaching only to ordinary suitors, do not reach them.

The power of the courts of the United States, to issue writs not specially provided for, is limited. They are confined to such as are conformable to the principles and usages of law. Judiciary act of 1789.

There are no principles of law, meaning the common law, or the statutes of the states, or of congress, that embrace a sovereign state. There is no usage in such cases. On the contrary, the usage is directly adverse. It holds to the exemption of such parties.

This difficulty occurred to the complainants. In 1830, the senator from Rhode Island, who signed the bill as solicitor, in 1832, introduced into the senate a bill, with minute provisions to remedy the defect. It did not pass. In 1828, the senators of New Jersey introduced a like bill to prepare for the controversy of that state with New York. It was not adopted. Every legislator who has been called to consider this subject, has admitted the defect of legislation.

2. This Court has no jurisdiction, because of the nature of the suit. It is in its character political; in the highest degree political; brought by a sovereign, in that avowed character, for the restitution of sovereignty. The judicial power of the government of the United States, extends, by the constitution, only to cases of law and equity. The terms have relation to English jurisprudence. Suits of the present kind, are not of the class belonging to law or equity, as administered in England. 1 Black. Com. 230, 231; 2 Vesey, jr., 56; Nabob of the Carnatic v. East India Company, 3 Vesey, 424; Barclay v. Russell, 1 Vesey, sr., 444. Penn v. Baltimore; where the agreement, and not the political right, was the subject of litigation. See Lord Hardwicke's opinion; New York v. Connecticut, 4 Dall. 4. By the judiciary act of 1789, the jurisdiction of the Supreme Court of the United States, where a state is a party, is confined to cases "of a civil nature."

This qualification was not in contradistinction to criminal cases, for no state could be, prosecuted by another state, as a criminal. It is intended to have reference to cases not political, or involving questions of sovereign power between states. Wiscart v. Dauchy, 2 Dall. 325. See, also, Drafts of the Constitution, printed for the members of the convention, and for their use only, and the successive amendments made, and in manuscript on said printed drafts; in the collection of the Massachusetts Historical Society.

The complainant has no equity on his own declaration. It is a stale demand, in the language of the books; and the fact appearing on the face of the bill, need not be pleaded. Beckford et al. v. Wade, 17 Vesey, jr.; Story on Equity, sec. 1520, and the Notes; Middlecot v. O'Donnell, 1 Ball & Beatty, 166; Hoveden v. Lord Annersley, 2 Scho. & Lefroy; Paul v. M'Namara, 14 Vesey, jr., 91; Gifford v. Hart, 1 Scho. & Lefroy, 406. The court will not permit a party to lay by and wait until the subject of dispute has acquired great value, and become connected with great interests and diversified relations.

Again: if the parties are to be treated in this Court as individuals, or private corporations, or even as states with only the rights of private litigants, then the bill must be dismissed, because, if it seeks an adjustment of boundaries, without claim to the soil; such a cause is no subject of equity jurisdiction. Atkins v. Haton, 2 Anstruther, 386; Fenham v. Herbet, 2 Atkyns, 484; Welby v. Duke of Rutland, 2 Atkyns, 391; Willer v. Smeaton, 1 Bro. Ch. Rep. 572; Bishop of Ely v. Kenrick, Bunbury, 322.

There is no such case in this country, nor in England, for jurisdiction only between towns or countries.

If the boundary is ascertained, and the defendant has encroached upon the complainant, the right between individuals must be ascertained in an action at common law, and not by bill in chancery; and the right must, in all cases, be settled at law, before chancery can adjust the boundaries. See the cases above cited.

The only title, in equity, to which the complainant can appeal, is that by which an equity is administered, not applied to agreements generally, but intended to preserve family honour, and family peace. Let this be applied to the sister states, in the great American family of the nation. It will leave undisturbed and unchanged, what has so remained for more than a century. Storkley v. Storkley, 1 Ves. & B. 30.

[The State of Rhode Island v. The State of Massachusetts.]

Mr. Hazard, for the state of Rhode Island:

The merits of this motion, sir, might have been more satisfactorily examined and discussed by the complainant's counsel, if we could have had the motion, and the specific grounds of it, put into writing, as we were desirous, and requested that they should be; but without effect.

It does appear to me, that a motion which goes to cut off one of the most important branches of the jurisdiction of the Supreme Court, exercised by it from its first establishment, and to deprive a party in court of the benefit of that jurisdiction, and of her only remedy for aggravated injuries, (as she has a right to insist in resisting a motion which would deprive her of a hearing,) that such a motion, and the specific grounds of it, ought to be presented in writing, with precision and fulness, and with adequate notice of them to the opposite party, to enable him to meet them, and to know what he has to meet. But we are now to answer this motion, verbally made, and to seek for the grounds of it, as they are scattered through a long and desultory argument; in the course of which, those grounds have taken so many different shapes, that it is not easy to recognise them for the same, or to reconcile them one with another. This being the case, it is not surprising that the counsel refused to put the specific grounds of their motion into writing. I have, however, endeavoured to make myself acquainted with the real question to be decided; and, with permission, will now present such views as I have been able to take of it.

Has this Court jurisdiction over the subject matter of, and over the parties to the bill in equity now pending before it? and has the Court now power to proceed to the hearing and trial of the cause, and to make a final decree therein? If neither branch of this question can be answered in the negative, there can be no good grounds for the present motion; however those grounds may be shifted, or multiplied, or repeated. Allow me to consider the first branch of the question. It is evidently purely a constitutional question, arising under the constitution, and only to be tried and settled by it. Turning, then, to the constitution, we find it there declared, that the judicial power shall extend " to controversies between two or more states;" and that in those cases "in which a state shall be a party, the Supreme Court shall have original jurisdiction." These are the words of the constitution; and this is a controversy between two states; and the state of Massachusetts is a party to it:

and the state of Rhode Island is a party to it; and this controversy is now pending before the Supreme Court. But it is contended by the counsel, that although the words of the constitution do embrace this controversy, yet it is not within the meaning and intention of that instrument; and that it was the intention of its framers to exclude such controversies from the jurisdiction of the Court. This is dealing with the constitution as Peter, Martin and Jack dealt with their father's will. But as it is the only pretension that could be set up against the constitutional jurisdiction of this Court, it is important for us to inquire, strictly, what was the meaning and intent of the framers of the constitution, in this respect? And here, fortunately, nothing is left to conjecture or tradition. The explicit, unequivocal intention of the framers of the constitution upon this subject, is matter of authentic public record. I beg leave to trace this constitutional provision for preserving harmony among the states, from its origin. Before the revolution, all controversies between the colonies or provinces, concerning boundaries, were carried up to the king, in council, and were by him settled. There was one such controversy between these same parties, Massachusetts and Rhode Island; and another between Massachusetts and New Hampshire; both of which were so settled. When the states asserted their independence, that tribunal, of course, was annulled. But the new states felt the necessity of immediately establishing, in its place, a competent tribunal of their own, with full jurisdiction over those dangerous controversies. And this they did in the articles of confederation; the ninth article of which, provides that "congress shall be the last resort, on appeal, in all disputes and differences now subsisting, or which may hereafter arise, between two or more states, concerning boundary, jurisdiction, or any other cause whatever." Congress to appoint judges to constitute a court for hearing and determining those causes. "And the judgment and sentence of the court to be appointed in the manner before described, shall be final and conclusive; and if any of the parties shall refuse to submit to the authority of such court, or to appear, or defend their claim or cause, the court shall, nevertheless, proceed to pronounce sentence or judgment, which shall, in like manner, be final and decisive; the judgment or sentence, and other proceedings being, in either case, transmitted to congress, and lodged among the acts of congress, for the security of the parties concerned." And congress did, accordingly, establish and organize the court, called the "court of appeals."

[The State of Rhode Island v. The State of Massachusetts.]

And that court took cognizance of, and decided a number of jurisdictional controversies between states; and among others, one in which Massachusetts herself was a party, and acknowledged the jurisdiction of the court, and submitted to its decision. It must be recollected, that the territorial descriptions and boundaries, contained in the colonial grants and charters, were necessarily loose and defective; and that in the progress of the settlements, in adjoining colonies, controversies must unavoidably arise as to their respective limits. And the greater the certainty of such conflicts, the greater was the necessity of providing an impartial tribunal for the peaceable adjustment of them. The language of the ninth article, just read, is descriptive of the state of things at the time: "disputes and differences now subsisting, or that may hereafter arise between two or more states, concerning boundary, jurisdiction," &c.

The court of appeals retained and exercised its jurisdiction over these controversies, until the adoption of the present constitution; when its place was supplied, and the exigency provided for by the establishment of a national judiciary, with full jurisdiction over the same controversies. And, by the twelfth section of the "act for regulating processes," &c., passed in 1792, it was enacted, "that all the records and proceedings of the court of appeals, heretofore appointed, previous to the adoption of the present constitution, shall be deposited in the office of the clerk of the Supreme Court of the United States, who is hereby authorized and directed to give copies of all such records and proceedings, to any person requiring and paying for the same, in like manner as copies of the records and other proceedings of the said court are, by law, directed to be given; which copies shall have like faith and credit as all other proceedings of said court."

The counsel of Massachusetts have expressed the idea that the United States came into existence with the present constitution; and that Massachusetts, as one of them, is bound by nothing before that date. This is a strange conception, indeed. Not only the states severally, but the United States, came into existence with the declaration of independence; and the first of the articles of confederation ordains, that "the style of this confederacy shall be 'The United States of America.'" It was "to form a more perfect union," and to strengthen the confederation, that the convention was called which formed this constitution. And here are the concluding words of the resolution of the old congress of 1787, recom-

mending the call of the convention: "For the sole and express purpose of revising the articles of confederation," &c. The convention met; and in revising the important ninth article, changed the words ".disputes and differences," to the word "controversies," taking the words "between two or more states," as they found them in the article. The tribunal was, of course, changed; for now an independent judicial department was established, which had no existence under the confederation. Not deeming it proper, in a permanent constitution, to designate particular, existing, and (it might be hoped,) temporary disputes between states, they used the comprehensive word "controversies," as fully including them all. We do not know that there were any other controversies at the time, between states, than those about boundary; and if there were, they must have been comparatively unimportant; none other were so likely to exist, or to be carried to extremities; and, therefore, the article, after the words, boundary and jurisdiction, merely adds the general expression, "or any other cause whatever;" apparently by way of precaution. The delegates from the several states knew that a number of those state controversies then still existed, and that more migh arise; and they were fully sensible how all-important it was to provide against their breaking out. The great object of the convention was (as expressed in the preamble to the constitution,) "to form a more perfect union, establish justice, insure domestic tranquillity, provide for the common defence, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity." And how was union to exist?—how domestic tranquillity, amidst contention among the members? How was justice to be established, if the strong were permitted to give law to the weak? and how were the rights of individual states to be preserved, if left unprotected from the encroachments of stronger neighbours? And what would become of the harmony and integrity of the Union, if all its members were not protected in the enjoyment of their equal rights?

But, in addition to all this, it is a remarkable fact, that this very question of jurisdiction, which Massachusetts now brings up, after the lapse of more than half a century, was directly acted upon and decided by the convention itself; as appears from the records of its proceedings. During its deliberations, the question was distinctly brought up, whether controversies between states, concerning jurisdiction and boundaries, should not be excluded from the jurisdiction of the courts. And the convention decided that they should not be

[The State of Rhode Island v. The State of Massachusetts.]

excluded. And the provision in the constitution, as it then was and still is, was retained; and this constitution was unanimously agreed to by all. the delegates. And, afterwards, the same question was discussed in the state conventions, and this provision was still retained and approved of; and the constitution ratified by every state. And several years afterwards, when the eleventh amendment to the constitution was adopted, and suits " against one of the United States by citizens of another state, or by citizens or subjects of any foreign state," were excluded from the jurisdiction of the courts, the remainder of the provision, giving jurisdiction over controversies between two or more states, was preserved untouched; and the states thereby manifested their continued approbation of that provision; and, accordingly, this question of jurisdiction has long been settled in this Court, by its uniform practice and decisions, in numerous cases, from its earliest establishment.

And now, what is it that Massachusetts has to say to all this? I beg the Court to consider whether every single objection, and the whole argument on her part, have not been objections and arguments against the constitution itself, rather than against the constitutional jurisdiction of the Court? In opposition to the constitution, they come armed with political axioms, and abstract theories of government; and with the aid of Montesquieu, and other learned writers, reason upon the science of government, and the distribution of appropriate powers among the three great departments.

Allow me, sir, to present a summary of the principal objections and positions upon which the counsel of Massachusetts appear most to rely. They lay it down, that a controversy between states, concerning jurisdiction and boundaries, is political, not judicial, in its character; that judicial courts can take cognizance only of controversies strictly judicial, not political, in their nature; that the present controversy concerns jurisdiction and sovereignty, and is therefore out of the judicial jurisdiction of this Court; and cannot be acted upon by it, without the assumption of political power. And, in support of their doctrine, the counsel have read a number of English cases, and the opinions of learned English chancellors. And what does it all amount to? Does it amount to any more than the plain, self-evident proposition, that courts created by sovereign power, and subordinate to it, cannot exercise jurisdiction over sovereign power, nor interfere with its prerogatives? Let us see if this is not the whole substance of the doctrine. In illustration of their

doctrine, the counsel have referred to the controversies between the colonies, concerning their boundaries, and over which the English courts exercised no jurisdiction. And why did they not? It was because there was a higher tribunal, which the colonies appealed to. The jurisdiction, in those cases, was in the king himself. He made the colonial grants, and gave the charters; reserving in them all allegiance and fealty to himself. He appointed the colonial governors; not excepting the governor of Massachusetts. Rhode Island almost alone elected her own governors. He, the king, therefore claimed and exercised jurisdiction over the colonies, as their feudal lord. But, had he so pleased, he might have transferred his royal jurisdiction over those controversies, to any of his courts. And had he done so, those controversies, whatever their character, and by whatever name called, political or civil, would have become the proper subjects of judicial investigation and decision. Another case, much relied upon by the counsel of Massachusetts, was that of The Nabob of the Carnatic against the East India Company; of which case, the court of chancery declined taking jurisdiction, because one of the parties was a sovereign prince, and the other, (although subjects of the crown,) acting by virtue of its charter as an independent state. It seems that, in this instance, the charter of the company had placed it above the law. But suppose that its charter had subjected it to the jurisdiction of the court of equity, in any controversies it might have with any of the surrounding princes, would the character of the parties, (the foreign prince assenting to the jurisdiction,) or the nature of the controversy, have formed any obstacle to the exercise of that jurisdiction? And would not the exercise of it have been strictly judicial in its character? The same plain principles of exposition embrace and dispose of every case and instance which the counsel have brought, or can bring in support of their doctrine. All these cases are governed by the peculiar institutions of England, and the structure of her government, in its various branches. No such question as this, of jurisdiction in controversies between two states of this Union, ever could arise in the English courts. If this jurisdiction is vested in the court, by the constitution, how preposterous is it to talk of the nature of the controversy, or the character of the parties! Suppose the controversy is political in its nature: what then?—Is there any reason in nature why it should not be subjected to judicial investigation and decision, as much as any other controversy? Suppose the parties to it are

[The State of Rhode Island v. The State of Massachusetts.]

two states: what then?--Is there any reason in nature why they should not be governed by the laws and principles of justice, as much as any other parties? All controversies, whatever their character and whoever the parties, if they are ever settled, and the parties will not settle them amicably, must be settled either by force or by the judgment of some tribunal. When the controversy is between sovereigns, the sword is the last resort, the "ultima ratio regum;" and the contest is waged at the expense of the blood and lives of their subjects. But if the controversy is submitted to some independent tribunal; that tribunal, call it by whatever name we may, must act judicially. It is not in my power to perceive how the sovereignty of Massachusetts is concerned, as she alleges, in the settlement of this question. Even absolute sovereigns have submitted their controversies about territorial limits, to independent tribunals; and no one ever imagined that the sovereignty of either was affected by their doing so.

But Massachusetts is not now possessed of unlimited sovereignty. All the states, when they ceased to be colonies, became sovereign and independent. But they were all sensible that they could not remain so if they remained disunited. They knew that it was by union alone they could preserve their liberties. They did unite; and, to secure their great object, they established this limited government of the Union, investing it with a portion of their state powers, and at the same time restricting themselves in the exercise of certain other powers. Thus, both the federal government and the state government are but limited governments; both equally bound by the constitution: and all acts of either, violating the contitution, are void. And it is the constitutional province and duty of the Court to declare such acts void, whenever the question of their constitutionality comes before it.

For in the formation of this federal republican system, an independent judicial department was deemed to be a necessary branch of the government, to prevent encroachments, and preserve a just equilibrium; and therefore, the constitution declares, that "the judicial power shall extend to all cases in law or equity arising under this constitution." And every decision of the Court upon the constitutionality of an act, either of congress or of a state legislature, concerns, to use the language of Massachusetts, their respective jurisdictions. How absurd, then, is it, to contend that the judicial power does not extend to political questions, or to questions in which the jurisdic-

tion of a state is concerned.   The only question here is, whether the states, by the constitution which they formed and adopted, did confer this jurisdiction upon the Supreme Court.  And is it not amply shown that they did confer it, and that they explicitly declared it to be their intention to confer it?

And is it for Massachusetts to gainsay this?   Massachusetts possessed a larger share of sovereignty under the confederation than she does under the present constitution.   Yet she then agreed and assisted in constituting the court of appeals, with full judicial powers over this very controversy; which was one of the then subsisting controversies concerning state boundaries and jurisdiction, specified in the 9th article.   In the convention, also, which formed the present constitution, Massachusetts agreed to invest this Court with the same jurisdiction.   And again, in her state convention, which ratified the constitution, she approved of and adopted this provision.   And, during all this period of time, Massachusetts had subsisting controversies with her neighbour states, concerning her territorial boundaries and jurisdiction; particularly this controversy with Rhode Island, and another with the state of Connecticut, of precisely the same character; which last was not terminated until the year 1801.   Massachusetts, therefore, by her own consent and acts, gave jurisdiction to this Court over the present controversy, as far as her consent and acts could give it.

Taking it, then, for granted, that it is fully shown that " this Court has jurisdiction over the subject matter of, and over the parties to the bill in equity now pending before it," I will proceed to the consideration of the 2d question: " Has the Court now power to proceed to the hearing and trial of this cause, and to make a final decree thereon?"

Mr. Justice BARBOUR asked Mr. Hazard, if he could point out any process by which the Court could carry a final decree in the cause into effect, should it make one.  For instance, if an application should be made by Rhode Island for process to quiet her in her possession, what process could the Court issue for that purpose?

Mr. Hazard said, that he had by no means overlooked that important question, but had given to it the fullest and most attentive consideration in his power.  But he had thought that it would be proper to reserve that question for the last to be considered; as in point of

[The State of Rhode Island v. The State of Massachusetts.]

order it appeared to be. At present, he was desirous of showing that the Court had full power, and ought to proceed to the hearing, and to make a final decree in the cause.

And what is there to prevent this proceeding? The Court have jurisdiction over the subject matter and over the parties; and the parties are here before the Court. The defendant state obeyed the subpœna issued from the Court, and came in more than three years ago; and took upon herself the defence of the suit, and put in her plea and answer thereto. At another term, she applied to the Court for an order upon the complainant to reply; and, at the last term, she made a written agreement with the complainant respecting amendments of the bill and pleadings; and she is now here in Court? What is there to hinder the cause from proceeding?

Why, it is contended, in the first place, that consent of one party cannot give jurisdiction to the Court; and authorities have been read to this effect. No one doubts, that when it appears by the record or otherwise, that the Court has no jurisdiction of the subject matter of the complaint; the consent of a party cannot confer jurisdiction. But when the Court has jurisdiction of the subject matter of the suit, the party defendant can consent to appear, and his appearance is conclusive upon him; even although if he had not appeared, he might not have been reached by the process of the Court. "The appearance of the defendants to a foreign-attachment in a circuit court of the United States, in a circuit where they do not reside, is a waiver of all objections to the non-service of process on them." Pollard v. Dwight, 4 Cranch, 421. "An appearance by the defendant cures all antecedent irregularity of process." Knox v. Summers, 3 Cranch, 496.

But Massachusetts has raised a number of other obstacles to the Court's proceeding to a hearing of this cause. The following, I believe, contains the substance of them all:

They are, 1. That the sole province of the Court is to expound and administer the law; and that here is no law for the Court to expound or administer. That congress has passed no act defining the controversy; no act prescribing the rule by which to try it; no rule of decision. 2. That by the 13th section of the judiciary act of 1789, congress has limited the jurisdiction of this Court, where a state is a party, to controversies of a civil nature; which this controversy is not, being political in its character; and that, therefore, congress meant to exclude controversies of this character from the

jurisdiction. 3. Congress has passed no act providing the process necessary to enable the Court to exercise its jurisdiction in the case. 4. That the Court possesses no power to carry a final decree in this cause into effect should it make one; congress, as is alleged, having made no law to enable it to do so.

The last of these objections, I will consider, presently, by itself. And as to the rest of them, if this doctrine is to prevail, what becomes of the jurisdiction expressly vested in the Supreme Court by the constitution itself; and what becomes of the Court itself, if it is to be placed upon the same footing as the inferior courts, which congress has power to establish, and of course, to regulate? By the 8th section, 1st article of the constitution, congress has power "to constitute tribunals inferior to the Supreme Court." But the Supreme Court was ordained by the constitution itself, and necessarily possesses all the judicial powers incident to such a court. Otherwise the constitution might be defeated, and the Supreme Court rendered a nullity by the act of another and but co-ordinate branch of the government. But congress has no power to deprive this Court of its constitutional jurisdiction, nor to restrain it in the exercise of that jurisdiction. And this Court would declare unconstitutional and void any act of congress having such an object.

The case of Martin v. Hunter's Lessee, has been referred to, and much stress put upon some general remarks of Mr. Justice Story, who delivered the opinion of the Court in that case. Those remarks were concluded in the following words, which were not read, but ought to go with them: "We do not, however, place any implicit reliance upon the distinction which has been stated and endeavoured to be illustrated." But what shows conclusively that the counsel are wholly mistaken in their understanding of the meaning of those remarks, is the fact, that in the case of New Jersey v. New York, which was before this Court fifteen years after that of Martin v. Hunter, the Court, of which that hon. judge was one, not only took jurisdiction of the case, although the state of New York had refused to appear, but decreed and ordered, that the subpœna in this case having been returned executed sixty days before the return day thereof, and the defendant not appearing, the complainant be at liberty to proceed ex parte.

But it is wasting time, I fear, to dwell upon such objections, when it has been so clearly shown that these cases were expressly and intentionally included in the jurisdiction of this Court by the constitu-

tion. I was quite at a loss to understand what was meant by "a rule of decision; a rule to try the case by:" until the counsel enlightened me by inquiring how, without an act of congress, the Court was to ascertain which state was right, and which wrong; alleging that, there being no such act, the Court could not proceed by the rule of the common law, or that of the civil law, or of any state law.

This is a novel idea. Such an idea was quite beyond the conception of the men who framed the articles of confederation. It did not enter into their heads that any thing more was necessary, to be done, to meet the exigency, than to establish a competent court, with sufficient powers to call the parties before them; and to try and determine these controversies in the same manner as they would any other controversies between any other parties. And it seems that the court of appeals, thus constituted, had the same idea of its province and duties, and found no difficulty in performing them; governing themselves by the principles and rules of justice, equity, and good conscience, and not dreaming that any different rule was furnished by the common law, or the civil law, or by any state law.

The 34th section of the judiciary act has been turned to again and again, as showing that congress had furnished a rule of decision, as it is called, in cases at common law; but no such rule for cases like the present. This is making a strange use of that short section of four lines, the whole purpose of which is to give efficacy to the local state laws, in trials at common law, in the courts of the United States, "in cases where they apply," says the section. That is, that cases arising under a local law shall be governed by that law. Thus, the state laws regulating the descent of real estates, or the rate of interest, for instance, ought, in all courts, to govern the cases arising under those laws. And this is the whole meaning of the section. The counsel have contended, that if any suit at all could have been instituted by Rhode Island, it ought to have been a suit at common law and not in equity. But no state law could apply to such a suit any more than to the present; and there are very many suits at common law which are not governed by any state law.

An expression (the word civil) used in the 13th section of the same act is also suspected by the counsel, of containing an important secret meaning, which the counsel think they have discovered. They insist that by the use of this word "civil," congress intended to take this controversy, and all of the same kind, out of the jurisdiction of

this Court. Surely, the counsel of Massachusetts must feel them-
selves under the necessity of going a great way for inferences, and
set a great value upon very slight ones, to draw them from such
sources as these. The words relied upon, are "that the Supreme
Court shall have exclusive jurisdiction of all controversies of a civil
nature, where a state is a party," &c.

The plain object of congress was to withhold from the inferior
courts jurisdiction in controversies between two or more states. And
to do this, they gave to the Supreme Court exclusive jurisdiction in
those cases, instead of original jurisdiction merely, which it had by
the constitution. The word civil is properly used, because all con-
troversies which do or can exist between two or more states, must be
of a civil nature, and none other; unless they engage in war, which
they have bound themselves by the constitution not to do. The
word civil does not mean amicable or peaceable; actions of trespass
and of ejectment are civil actions. Civil is technically and general-
ly used in contradistinction to criminal. There is not the slightest
ground for supposing that the word civil was intended to be used in
contradistinction to political. Congress would never have taken so
blind a way, so unintelligible and futile, to effect such an object as the
counsel of Massachusetts wish to effect. Nor can any such distinc-
tion be made. If this is a political controversy, so is it a civil con-
troversy. And if such a distinction could be forced upon the words,
it would bring the section to this construction: that the Court is left
to its original jurisdiction derived from the constitution, in this and
other like controversies between states; but does not take exclusive
jurisdiction of them by virtue of this section of the judiciary act.

But, there is another word in the front part of this section,
which, in its plain, common sense meaning, I think, is much more
significant than the word which the counsel have endeavoured to
render so cabalistic. And that is the word all—all controversies.
This same word, used in another place, has been thought all-import-
ant, and great respect has been shown to it by the counsel of Massa-
chusetts. By the constitution, "the judicial power shall extend to
all cases in law and equity; arising under this constitution," "to all
cases affecting ambassadors," &c. "to all cases of admiralty and ma-
ritime jurisdiction, to controversies to which the United States shall
be a party, to controversies between two or more states," &c. &c.
And because the repetition of the word all is not kept up throughout
the whole section, it is inferred that the constitution intended to con-

fer a less extensive jurisdiction in some of the cases enumerated than in others.

Now, congress, in framing the judiciary act, did not deal in such far-fetched inferences. Congress saw no such meaning in that section of the constitution; and therefore it declares in this same 13th section of the act, "that the Supreme Court shall have exclusive jurisdiction of all controversies of a civil nature, where a state is a party." Congress did not intend to alter the constitution. It merely expressed what it understood to be the meaning of the section referred to. Now, although I have no quarrel with the word civil, I should not be willing to give the word all, in exchange for it. But, sir, why is it that so much effort is used to induce this Court to believe that congress is unfriendly to its jurisdiction over these cases? This is not very lawyerlike, nor very respectful to the Court. This Court will look for its constitutional powers to the constitution itself; and will not allow any other department to construe that instrument for them. In many cases, this Court have accurately defined, not only its own constitutional powers and duties, but those of the other departments, legislative and executive, as by the constitution it is authorized and bound to do on proper occasions. And, let me ask, if congress possesses such power over the jurisdiction of this Court, why was it necessary for the states themselves to make the 11th amendment to the constitution, for the purpose of taking away the jurisdiction in suits "against one of the states by citizens of another state, or by citizens or subjects of a foreign state?" But, it is not true that congress is unfriendly to this jurisdiction. There is no single instance in which congress has manifested such disposition. On the contrary, in this same section of the judiciary act, we find it conferring exclusive jurisdiction, where, by the constitution, the Court had only original jurisdiction. And without any appearance of disapprobation, congress has seen this Court, from its earliest establishment, exercising its constitutional powers in these cases, and in others in which a state was a party; adopting its rules of practice and proceeding, and its general, permanent orders applicable to them; and prescribing its processes, and the service and return of them as occasion required.

The third objection is, that congress has provided no forms of powers to enable the Court to exercise its jurisdiction. This objection, I should think, was reduced to a very small size. The writ of subpœna was issued, served and returned agreeably to the general or-

der of the Court.    And the defendant state obeyed that process and
appeared, took upon herself the defence of the suit; and I under-
stood her counsel to say, that he should not urge any objection to
this proceeding of the Court.    And, if Massachusetts had refused to
appear, the Court would have had it fully in its power to have pro-
ceeded in the cause, as it did in that of the state of New Jersey
against New York.    But Massachusetts has appeared, and is now in
Court.    What further process then is now wanting to enable the
Court to proceed to the hearing of the cause.    I know of none.    Yet
the counsel of Massachusetts still insist that the Court cannot go on
a step without an act of congress.    Let me then inquire: 1. What
has been done by congress upon this subject?    2. What has been
done by the Court?

   1. A judiciary act was passed in 1789, at the first session of con-
gress; and a process act at the same session, which, with many ad-
ditions, was rendered permanent by a second process act passed in
1792.    The 13th section of the judiciary act, which gives exclusive
jurisdiction to the Supreme Court in these cases, has already been
read.    The 14th section, enacts "that all the beforementioned courts
of the United States shall have power to issue writs of scire facias,
habeas corpus, and all other writs not especially provided for by
statute, which may be necessary for the exercise of their respective
jurisdictions, and agreeably to the principles and usages of law."
The 17th section enacts, "that all the beforementioned courts of the
United States shall have power to make and establish all necessary
rules for the ordinary conducting business in said courts, provided
such rules are not repugnant to the laws of the United States."    The
process act, 1st section, enacts that "all writs and processes issuing
from a Supreme Court or a circuit court shall bear test," &c. and
shall be signed by the clerk, and sealed with the seal of the court."
The 2d section enacts, "that the forms of writs, executions and other
process, their style and the forms and mode of proceeding in suits
in those of common law, shall be," &c. "and in those of equity, and
in those of admiralty and maritime jurisdiction, according to the
principles, rules and usages which belong to courts of equity, and to
courts of admiralty respectively, as contradistinguished from courts of
common law; except so far as may have been provided for by the act
to establish the judicial courts of the United States; subject, how-
ever, to such alterations and additions as the said courts respectively
shall, in their discretion, deem expedient; or to such regulations as

the Supreme Court of the United States shall think proper, from time to time, by rule, to prescribe to any circuit or district court concerning the same." The 18th, 24th and 25th sections of the judiciary act, first referred to, recognises the power of the Court to issue executions upon its judgments and decrees.

Thus much has been done by congress; and it is apparent that that department has always considered that every thing had been done, on its part, necessary to enable the courts to perform all their judicial duties; and fully to exercise all their judicial functions and powers. Congress saw that the courts were proceeding in the exercise of those powers without difficulty or impediment, and that no further legislative action was called for or needed. And so have the courts thought. In the case of Weyman v. Southard, 10 Wheat. 1, the Court considered itself possessed of full power over the whole proceedings in suits in equity, from their commencement to their final termination by satisfaction of the decrees or judgments.

It has been suggested by the defendant's counsel, that congress has omitted to provide for the exercise of this branch of the jurisdiction of the Court; because it did not intend that it should be exercised. This is impeaching the fidelity of congress to the constitution. But, fortunately, the imputation is wholly unfounded. It is alleged, also, that congress, by the judiciary act of 1789, has provided rules of proceeding in all, or nearly all the ordinary cases which can arise at common law, or in admiralty; but none in such cases as this. This is as palpable an error as could well be committed. In the case last mentioned, Weyman v. Southard, which was a case at common law, objections were made to the process, and to the service and execution of it; and it was contended that the proceedings were not authorized by any act of congress. But the Court, after remarking that the chancery power of the court over all the proceedings in suits in equity, from their commencement to their final termination, were unquestionable, proceeded in these words:—" It would be difficult to assign a reason for the solicitude of congress to regulate all the proceedings of the Court, sitting as a court of equity, or of admiralty, which would not equally require that its proceedings should be regulated when sitting as a court of common law." Thus we find, that while the equity powers of the Court in these cases is considered as having been placed beyond a doubt by the acts of congress, its parallel powers, in cases at common law, have required to be sustained by inferences and reasoning.

And it was decided in the last case referred to, and in that of the United States Bank v. Halstead, 10 Wheat. 54, that these powers are not legislative in their character. They must, then, be simply judicial in their character; and, if necessary, must be incident to the judicial powers and functions.

Let me now inquire what has been done by the Court in pursuance of its constitutional and legal powers. In 1791, the Court adopted the following general order: viz., " That this Court consider the practice of the court of king's bench, and of chancery, in England, as affording outlines for the practice of this Court; and that they will, from time to time, make such alterations therein as circumstances may render necessary." 1 Cond. Rep. 8. In 1796, the following permanent general orders, or rules, were established, viz: " 1. Ordered that when process at common law, or in equity, shall issue against a state, the same shall be served upon the governor, or chief executive magistrate, and the attorney general of such state. 2. Ordered, that process of subpœna issuing out of this Court in any suit in equity, shall be served on the defendant sixty days before the return day of the said process: And, farther, that if the defendant, on such service of the subpœna, shall not appear at the return day contained therein, the complainant shall be at liberty to proceed ex parte." 3 Dall. 320; 1 Peters' Cond. Rep. 141. These several general orders, or rules, are still in full force, and have been practised upon by the Court from the time of their adoption. Can there be a doubt that they are strictly in conformity to the constitution, and the acts of congress referred to? In the case of The State of New Jersey v. The State of New York, 5 Peters, in 1831, the Court remark, that " At a very early period of our judicial history, suits were instituted in this Court against states, and the questions concerning its jurisdiction and mode of proceeding, were necessarily considered." The Court then proceed to review a number of the preceding cases which had been before it, in which a state was a party. " So early as August, 1792, (says the Chief Justice, who delivered the opinion of the Court,) an injunction was awarded, at the prayer of the state of Georgia; The State of Georgia v. Brailsford, 2 Dall. 402; to stay a sum of money recovered by Brailsford, a British subject, which was claimed by Georgia, under her acts of confiscation." This was an exercise of the original jurisdiction of the Court, and no doubt of its propriety was ever considered.

In February, 1793, the case of Oswald v. The State of New York

came on; 2 Dall. 402. This was a suit at common law. The state not appearing, on the return of the process, proclamation was made; and the following order entered by the Court: "Unless the state appear by the first day of the next term, or show cause to the contrary, judgment will be entered by default against the said state." At the same term, a like order was made in the case of Chisholm's Executors v. The State of Georgia; and at the next term, 1794, judgment was rendered in favour of the plaintiffs, and a writ of inquiry awarded. Grayson v. The State of Virginia, 1796, 3 Dall. 320; 1 Peters' Condensed Rep. 141. This was a bill in equity; and it was in this case that the Court adopted the two last general orders before-mentioned. In Huger v. The State of South Carolina, the service of the subpœna having been proved, the Court determined that the complainant was at liberty to proceed, ex parte. He accordingly moved for, and obtained commissions to take the examination of witnesses in several of the states. 3 Dall. 371; 1 Peters' Cond. Rep. 156. The Court also noticed the cases of Fowler et al. v. Lindsay et al.; and Fowler v. Miller, 3 Dall. 411; 1 Peters' Cond. Rep. 189; and the case of The State of New York v. The State of Connecticut; 4 Dall. 1; 1 Peters' Cond. Rep. 203. "It has then," proceeds Chief Justice Marshall, "been settled by our predecessors, on great deliberation, that this Court may exercise its original jurisdiction in suits against a state, under the authority conferred by the constitution and existing acts of congress. The rule respecting process, the persons on whom it is to be served, and the time of service are fixed. The course of the Court, on the failure of the state to appear, after due service, has been also prescribed." And, accordingly, the Court did proceed, and made the order, the first part of which has already been read; and which order thus concludes: "And it is further ordered, that, unless the defendant, being served with a copy of this decree sixty days before the next ensuing August term of this Court, shall appear on the second day of the next January term thereof, and answer the bill of the complainant, this Court will proceed to hear the cause on the part of the complainant, and to decree on the matter of the said bill." But, before the cause came to a final decree, the state of New York compromised the controversy with the state of New Jersey, to the satisfaction of the latter state. The case now before the Court is the same, in character, and in all the principles involved in it, as that of New Jersey and New York.

Why should not the Court proceed in this case, as they decided to proceed in that; and in conformity to its subsisting rules and orders?

With permission of the Court, I will now proceed to consider the last objection which has been raised by Massachusetts to the jurisdiction of this Court; and upon which she appears mainly to rely, for producing an effect upon the minds of the Court. That objection is, that should the Court make a final decree in the cause, it will have no power to carry it into effect.

When the clear and explicit provisions of the constitution are considered, and the several laws subsequently passed by congress, for the purpose of aiding in the fulfilment of those provisions, I cannot conceive how any doubt can exist of the power of this Court to carry into effect any decree, which by those provisions, it may be authorized and bound to make. And, if the constitution stood alone, I should still entertain the same opinion. It is a universal axiom, that the grant of a principal power, ipso facto, includes in it all the minor, subsidiary powers, necessary for the exercise of the main power, as incident to it. What a construction would it be to put upon the constitution, to say that the people, by that instrument, had ordained and established a tribunal to take cognizance of, and determine certain enumerated controversies, over which, for that purpose, they had given to it full and express jurisdiction; but that the tribunal so established, could not perform its duty, for want of power to cause its decisions to be carried into effect? What would the people have a right to say to a tribunal which should render to them such an account of its services; or, rather, such an excuse for the neglect of its duty?

But is it not important here to inquire, whether, in considering the present question of jurisdiction of this Court to hear, try, and make a final decree in this cause, it can be at all necessary or useful to inquire what further powers the Court may, or may not, exercise upon any future, distinct application, which may or may not be hereafter made to the Court; and upon which new and distinct application, should any such be made, the Court will then decide as it shall deem right. If, by the constitution and existing laws, the Court have jurisdiction over this cause, to hear, try, and decide it; is it not bound to exercise that jurisdiction, when appealed to: and ought the Court to decline exercising this unquestioned jurisdiction, from an apprehension that possibly it may, hereafter, be asked to do something more, which, possibly, it may not have it in its power to

do? In the case of New Jersey and New York, the Court said, that, "inasmuch as no final decree has been pronounced, or judgment rendered in any suit heretofore instituted in this Court against a state; the question of proceeding to a final decree, will be considered as not conclusively settled, until the cause shall come on to be heard in chief." Thus the Court determined to hear the cause in chief, without anticipating what its final decree might be; much less, what, if any thing, might remain to be done, after the decree. And the Court did then decree, "that the complainant be at liberty to proceed, ex parte;" and further decreed, that, "unless the defendant state appeared, the Court would proceed to hear the cause on the part of the complainant, and to decree on the matter of the said bill." There are many cases in which decrees in chancery cannot be fully, if at all, executed; but that has never been considered a reason why the Court should not pronounce the decrees which it has the power to pronounce.

But, I shall not dwell longer upon these questions; because there is another position which, if sound, I think entirely obviates the objection of the want of power in the Court beyond the power of making a final decree in the cause.

That position is, that the pronouncing of a final decree in the cause will complete the exercise of all the jurisdiction which the cause can require; and will be a final, conclusive and permanent termination of the controversy. This position, upon much reflection, I believe to be sound; or I certainly should not venture to advance it before this honourable Court; as I do, entirely upon my own responsibility, as to its soundness or unsoundness.

A final decree in this cause will have no resemblance to a judgment of Court for a sum of money to be collected on execution; nor to a judgment in ejectment to be followed by an execution for possession. No process would necessarily follow a final decree in this cause. We ask no damages of Massachusetts; no delivery of possession; no process to compel her to do or undo any thing. All we ask is a decree, ascertaining and settling the boundary line between the two states.

Mr. Justice Thompson asked Mr. Hazard if the bill did not contain a further prayer; a prayer that Rhode Island might be restored to her rights of jurisdiction and sovereignty over the territory in question; and quieted in her enjoyment of them? And, that part of

the bill being read, it appeared that it did contain such a prayer, in addition to the prayer that the boundary line between the two states might be ascertained and established.

Mr. Hazard said that the latter part of the prayer of the bill had escaped him; but it did not vitiate the bill. The Court would have it in its power to grant so much of the prayer as they might think right. All Rhode Island asked for was a decree ascertaining and establishing the true boundary line between her and Massachusetts. When that is settled by a decree, the rights of jurisdiction and sovereignty will necessarily follow: the decree will execute itself; and this controversy can no longer exist. When the boundary line is settled, it will be the same as all other established boundary lines; and the relative situation of Rhode Island and Massachusetts will be the same as that of all other adjoining states.

And why should not Rhode Island be placed upon the same footing, in this respect, with her sister states? Why should her jurisdictional boundary line be left in dispute, and she exposed to encroachments; when all other controversies of this kind have been lastingly settled?

Am I not sustained, in the position I have here taken, by the opinions and acts of the learned men who framed the articles of confederation? They enacted that the decrees of the court of appeals, in the cases over which jurisdiction was given to it, should be final and conclusive. And it was their opinion that nothing more than a final decree would be necessary; and, therefore, they provided for no further proceedings. And, what ought to be conclusive is the fact, that although a number of decrees in such cases were made by the court of appeals; no difficulty was ever experienced, and no further process was ever found to be necessary.

It is true, that after the line is settled, Massachusetts may do other wrongs to Rhode Island for which other remedies may be necessary; and so she may to any other state: but this controversy about the line will be at an end. Should Massachusetts hereafter encroach upon Rhode Island, that will be a new aggression; the same as if she should encroach upon any other state, near or distant; the same as if she should encroach upon the state of New York, or Connecticut, or New Hampshire: or, again, upon Rhode Island, on her eastern boundary: with all of which states Massachusetts has had controversies about her boundaries, and has always been found the aggressor. But when those boundaries were ascertained by the com-

[The State of Rhode Island v. The State of Massachusetts.]

petent tribunals, all difficulties were at an end.  When Rhode Island,
upon the decision of the king in council, received under her juris-
diction, her county of Bristol, and her towns of Tiverton and Little
Compton, over which Massachusetts had long exercised jurisdiction,
she met with no obstructions from that state.  Neither did New
Hampshire, whose controversy with Massachusetts, was decided by
the same tribunal.  Still the Court are told by Massachusetts that
they cannot carry their decree into effect.  Allow me to ask, sir, in
what possible way Massachusetts can have it in her power to defeat
or evade the effect of that decree?  The decree itself, the moment it
is pronounced, will establish a new state of things between Massa-
chusetts and Rhode Island.  And what are the means that Massa-
chusetts can resort to, to prevent that decree from taking full effect
by its own force and operation?  I should be glad to hear the attor-
ney-general of Massachusetts inform the Court what it is that that
important state is going to do to set the decree of this Court at de-
fiance, and render it a nullity?  Massachusetts is not going to erect a
line of batteries along this strip of land; nor to station a military
force there to take hostile possession of it.  If she should, it would
be invasion; an ample remedy for which is provided in the 4th arti-
cle 4th section of the constitution.  And Rhode Island would be
under no necessity to apply to this Court for an injunction in such a
case.  And this again shows the meaning and propriety of the ex-
pression "civil controversies," used by congress; and, no doubt,
meant by the constitution.  I ask again, then, what can Massa-
chusetts do to prevent a decree of this Court taking full effect by its
own force and operation?  She can do nothing.  She can only say
that she will retain jurisdiction over this district, the decree notwith-
standing.  But let us examine what she can make this amount to.
Massachusetts, as a state, is not the proprietor of this strip of land.
If she own any land there she will, of course, still own and retain it;
and her right and title will be held as sacred as those of any other
owners of the soil.  There is no shire town within this district; and
of course, probably, no public buildings belonging to the state.  If
there are, they will still be her property, though not appropriated to
the same uses.  There will be nothing, therefore, which Massachu-
setts can retain the possession of, which she will be required to re-
linquish.  Jurisdiction over the district it will be out of her power
to exercise, for she will not have it; that (in her) will be extinguished
by the decree, ipso facto.  What jurisdiction, after the decree, can

she exercise? She cannot number the inhabitants of this district as part of her population, or of her militia; for they will not be so any more than the inhabitants of the county of Providence. And, no more can she tax them, or their lands, or other property; for they will not be subject to her laws. Her tax-gatherers can collect no taxes; her ministerial officers execute no process within that district, for it will be out of the jurisdiction of their state. And, should they attempt to do so, they will carry no Massachusetts authority with them over the boundary line established by the decree of this Court. They will be trespassers; and subject themselves to the penalties provided for the punishment of trespassers. With as much right might Massachusetts send her officers into any other part of the state as this; but the civil authorities of Rhode Island would have no difficulty in dealing with such offenders. They would be violators of the laws of the land; not only of the laws of Rhode Island, but of the constitution of the United States, and of the acts of congress, under the authority of which the decree of this Court would have been made. They could not escape conviction and punishment. And any countenance Massachusetts might give to them would but aggravate the offence and the punishment. No aid from this Court would be needed. The existing laws would furnish a perfect remedy for the wrongs attempted to be done.

Those Massachusetts' officers, sheriff, tax-gatherers, or whatever they might be, would have no authority to demand aid from the people of the adjoining county in Massachusetts. Nor is it probable that any of those people, (not being bound to obey such demand,) would have any concern in violating the rights of another state, established by a decree of the Supreme Court of the Union. But should those officers, on any occasion, carry with them a sufficient body of men from Massachusetts, to enable them, for the time, to seize upon the property or persons of any of the inhabitants of the state of Rhode Island; (of which this district would then be a part;) and to escape into Massachusetts before they could be arrested, they would all alike be criminals, and punishable as such. And, by the fourth article, second section of the constitution of the United States, and that of congress passed in conformity thereto, the executive authority of the state of Massachusetts, on demand made by the executive authority of the state of Rhode Island, would be bound and compelled to deliver up those criminals to be removed for trial to the state having jurisdiction of the crime. And here again, Rhode

[The State of Rhode Island v. The State of Massachusetts.]

Island would have a perfect remedy without the interposition of this Court. Nor would Massachusetts have it in her power, effectually, to obstruct the magistrates and civil officers of Rhode Island in the execution of their official functions. Those magistrates and officers, in the performance of their lawful duties, within the jurisdiction, and under the authority of their own state, would have nothing to apprehend from any quarter. Should any of them be lawlessly seized, and carried within the jurisdiction of Massachusetts, still they would have nothing to apprehend. The decree of this Court, the laws of the state in which they acted, and the constitution and laws of the United States, would sustain and save them harmless. These authorities, the respectable judicial tribunals of Massachusetts, would not set at defiance; and if they should, their judgments and proceedings would speedily be revised and corrected here.

Thus, we find that it would be wholly out of the power of Massachusetts, to prevent a final decree of this Court from taking full effect, by its own force and operation.

I could not help feeling great surprise, when I heard the attorney general of Massachusetts so solemnly and portentously warning this Court of consequences, and expressing his anxious hopes, that if it should decide against Massachusetts, it will, for the honour of the Court, and for the honour of the country, be sure to find some way to execute its decree. What! Does Massachusetts threaten? Is Massachusetts ready to become a nullifying state? and to set up her own will, in defiance of the decrees of this Court, and of the constitution itself? This Court will not make a decree against Massachusetts, unless it shall be satisfied that the constitution authorizes it, and that equity requires it. And for Massachusetts to expect to prevent the Court from making such a decree as it may deem constitutional and equitable, by telling the Court how formidable she is, and how contumacious and lawless she means to be in her defiance of its decrees; this, it appears to me, is almost as deficient in policy, as it is in modesty. But let Massachusetts take her own course, and whatever that may be, it will excite no apprehension in Rhode Island; although she may grieve that so noble a state should conduct in such a manner as to tarnish her high and well merited renown. If, sir, the principles and positions I have endeavoured to establish are sound, and have been established, I must think that they reach and dispose of all the material objections which the counsel of Massachusetts has raised against the jurisdiction of this Court.

[The State of Rhode Island v. The State of Massachusetts.]

There were a great number of other objections, or suggestions and statements made by the counsel, some of which I will now just advert to; although I do not consider them as having any bearing upon the question before the Court. It is alleged that the five thousand inhabitants of the district in question, (I know not how many there are,) have a right to be parties to this suit, and are not. If this was so, it would be no objection to the jurisdiction of the Court. The Court would take care that they were made parties before it proceeded further. But all the proper parties are here in Court. This controversy is about state jurisdiction, not titles to soil and freehold. I suspect, however, that if those inhabitants were consulted, they would not consent to be made defendants; but would rather join with the complainant state. They are taxed hard in Massachusetts, and would have no state taxes to pay in Rhode Island. And, at one time, a very large number of the respectable inhabitants of that district, petitioned the legislature of the state of Rhode Island to be received into that jurisdiction, to which they claimed rightfully to belong.

It is objected, also, 1. That the bill contains matter in bar to itself. 2. That the bill admits that Rhode Island was never in possession, and that the suit is barred by prescription. 3. That the controversy has been settled. These might be proper matters for discussion and proof (they are not proved yet, and cannot be, for not one of them is true,) upon the trial of the cause; but, evidently, have nothing to do with the question of jurisdiction. Because it appeared that the Massachusetts charter of 1628, upon a scire facias from the court of king's bench, was revoked and annulled in 1685; and that she did not get a new charter until 1691; her counsel has stated that Rhode Island, while a colony, abandoned and surrendered up her charter. This is a mistake. Connecticut and Rhode Island never did surrender their charters; although they were demanded, and great efforts made to obtain possession of them. The Connecticut charter was hidden in the hollow of the venerable old oak tree at Hartford; and that of Rhode Island was also preserved secure from its enemies, and is now in her secretary's office at Providence. The counsel (in sport, I suppose,) has indulged his fancy in describing Rhode Island as she would have been had the claims upon her territory, set up by Plymouth on the east, and Connecticut on the west, been successful. Very true; and Rhode Island would have been stripped indeed; especially with Massachusetts helping herself to five miles more of her territory on the north, which I suppose the

[The State of Rhode Island v. The State of Massachusetts.]

attorney general of Massachusetts thinks was quite venial, while Rhode Island's territory was looked upon as free plunder. But those claims upon the territory of Rhode Island, on the east and west, were found and decided to be unjust. And it was Massachusetts herself, not Plymouth, which had got possession of the county and towns within the limits of Rhode Island, as beforementioned, and from which, after a faint struggle, she was compelled to retreat. There is no probability, that a small state will make unreasonable claims, much less encroachments upon large ones.

The counsel of Massachusetts have asked the Court to consider the character of the original colonial charters, and have read passages from Bancroft's History, to show how loose and defective those charters were, and how difficult it would now be to decide controversies growing out of them. That a case will be a difficult one to settle, is not a very good reason to offer for a court's not taking cognizance of it. But in the present case, no difficulty whatever can arise from such a source. The charters both of Rhode Island and Massachusetts are clear and intelligible in this particular. Rhode Island by her charter, is bounded north by the south line of Massachusetts; and that line, by the Massachusetts charter, was to be three miles south of the most southerly part of Charles river; the sole question, therefore, to be settled, is a question of construction of that part of the Massachusetts charter. One set of the Massachusetts commissioners appointed to settle this line with Rhode Island, reported correctly to their legislature the construction which each state relied upon. The Rhode Island construction was, that the most southern part of Charles river proper—Charles river itself, that is, what was known by the name of "Charles river," was the point from which to measure off the three miles. On the other hand, Massachusetts insisted that the most southerly source or spring head of any run of water, running northerly and finding its way into Charles river, was to be taken as the most southerly part of Charles river. And accordingly they found a brook, called Mill Brook, which run from the south into Charles river. This they traced up to a pond, called "Whiting's Pond," out of which the brook run; then going to the south end of the pond, they found another brook, called Jack's Pasture Brook, which they traced up south to its spring head, and this they called the most southerly part of Charles river. Surely there can be no difficulty in deciding by the charters, which of these constructions is the correct one. These are the merits of the case,

and I am sensible that they have no bearing upon the question of jurisdiction before the Court. But the counsel of Massachusetts have repeatedly introduced the merits; and I presume it is not improper for me to follow him so far as to state them correctly.

Precisely the same question was decided more than an hundred years ago, in the controversy between Massachusetts and New Hampshire. The northern boundary of Massachusetts is defined and limited in her charter, in the same terms as her southern boundary. She was to have three miles north of the most northerly part of the Merrimack river. Upon this she set up the same claim upon New Hampshire, as she now does upon Rhode Island; and by her construction, she would have taken the whole of New Hampshire, and the greater part of the province (now state) of Maine. But her pretensions were decided to be wholly unfounded and unjustifiable; and she was compelled to draw herself within her charter limits. And why has she not respected that decision, and contented herself with the same limits on the south as on the north?

Massachusetts, also, had precisely the same controversy with the state of Connecticut, about the westerly part of this same line; that state and Rhode Island, by their charters (granted about the same time, 1662–3) being both bounded northerly upon the same straight line, to be drawn due east and west throughout. But Connecticut would not submit to the encroachments of Massachusetts. And, although she had entered into a written agreement with her, establishing the line as it then was; and that agreement had been formally ratified and confirmed by the legislatures of both states, (which was never the case with us;) yet Connecticut proved, that misrepresentations and impositions had been practised upon her commissioners and government, in the running of that line; and she brought Massachusetts to a sense of justice, and obtained from her a large part, and not the whole of the territory which the latter had wrongfully taken within her limits. And now, whenever you look upon any map including the three states, or that part of them, you see the Connecticut northern line is miles in advance of that of Rhode Island, which ought to be a continuation of it; and the government of Massachusetts has not caused, and cannot cause any survey or map of that fine state to be taken or published; without recording anew and emblazoning her unjust encroachments upon Rhode Island.

A singular appeal was made to your honours, in the gentle tones of persuasion by the counsel of Massachusetts. They remind the Court

[The State of Rhode Island v. The State of Massachusetts.]

that courts of equity do not countenance family quarrels, in which the honour and feelings of families may be exposed to injury. Very well. And here is the important state of Massachusetts, surrounded by six other states, all of which show her great respect and deference, and manifest a desire to continue in strict harmony with her.   But Massachusetts is not satisfied with this.   She encroaches, and encroaches upon her neighbours until their patience is exhausted; and after long forbearance they are compelled, one after another, to complain of her aggressions and seek redress.   And thus called upon, here comes Massachusetts quite undisturbed, and to smooth matters over, talks about family disputes, and family honour, and the relations between neighbouring sister states, which make it improper to listen to their trifling complaints against each other; and so she advises that the complainants be reprimanded and sent home.   But this did not answer before the old tribunal of the king in council, nor before the American court of appeals. ' Rhode Island, the last of the injured states, whose grievances alone remain unredressed, entertains a high respect for her elder sister, Massachusetts.   But I take it upon myself, to assure this honourable Court, should it think itself bound in justice to make a decree in her favour, she will not be offended nor complain of it; although the decree must be against that respected elder sister.

Allow me to conclude my remarks more seriously, and with matter more important.   The counsel of Massachusetts have talked much of the proper division of powers between the three great departments of government; the legislative, executive, and judicial. And they insist that the judicial is not the proper department to have cognizance of these controversies.   Pray, have you heard them point out which of the other departments is the proper and appropriate one; or what other tribunal there is to exercise this jurisdiction?   The idea of investing the executive with jurisdiction over controversies of any kind, whether political or civil, between states or individuals, has never entered into the head of any man. And is it not evident, that jurisdiction over such controversies cannot consistently be exercised by the legislative department of any well-balanced government?   And, when the structure of the federal and state governments, relatively to each other, the partition, limitation, and adjustment of their respective powers, is considered, the incompatibility of such a legislative jurisdiction is still more glaring. And, therefore, the constitution of the United States has not per-

mitted the exercise of any such jurisdiction to either the legislative or executive department; but has expressly conferred it upon the judiciary, which is free from all the objections that lay against the other two. What then does Massachusetts mean? Does she mean, that in her controversies with any of her sister states, she is not amenable to justice, before any tribunal?—And that there is no remedy for an injured sister state, for any wrongs she may suffer at her hands? That there shall be no wrong without a remedy, is a first principle, an axiom in all free governments. Is this the country in which that great fundamental principle of right and justice is to be first abandoned?

Mr. Justice BALDWIN delivered the opinion of the Court:

At the January term of this Court, 1832, the plaintiff filed a bill in equity, presenting a case arising under the various charters fro n the crown of England to the Plymouth Company, in 1621; to Massachusetts in 1629; to Rhode Island in 1663; the new charter to Massachusetts in 1691: together with sundry intermediate proceedings of the council of Plymouth: the result of which was to vest in the colony of Massachusetts and the king, all the rights of propriety and government previously granted to that company as a political corporation. The bill also set out the repeal of the original charter of Massachusetts on a scire facias in the court of chancery in England, the grant by the crown and acceptance by the colony of a new charter, subsequent to the charter to Rhode Island.

All these acts are specially and at large set out in the bill, but need not in this stage of the cause be referred to by the Court in detail. They present the claim of the plaintiff to the territory in controversy between the two states, in virtue of these charters, according to the boundaries therein described.

Independently of the claim under the charter of 1663, the plaintiff asserts a previous right in virtue of grants from the Indians, and settlements made under a title thus acquired: and also asserts, that under both titles, the inhabitants of Rhode Island made settlements on the lands immediately south of the boundary between the two colonies as now asserted; which settlements were so made and continued from the time of the purchase from the Indians, before, under the charter, and afterwards, though the line was not defined and disputed.

The bill then proceeds to state the existence of controversies between the two colonies, at a very early period; to settle which com-

missioners were appointed by each colony in 1709, and at various other periods down to 1809; and sets forth the proceedings of the commissioners of the colonies before the revolution, and the states afterwards, down to 1818.

For the present purposes of this case, it is necessary to refer only to one subject matter of these proceedings during this whole period, which is presented in the bill in the same aspect throughout; that subject is the agreement of 1709, and 1718; and the acts done pursuant thereto, which are recited at large in the bill. It then states the agreement of the commissioners of the two colonies, that a line should be run and marked as their boundary, which was done; a survey made and returned, together with all the proceedings to the legislatures of the respective colonies, accepted by Massachusetts, but as the bill avers, not accepted and ratified by Rhode Island. This is the line now claimed by Massachusetts; and whether the charter line or that, is the true line of right and boundary between the two states, is the only point in controversy in this case.

The bill avers that this line was agreed on in consequence of a representation by the Massachusetts' commissioners to those of Rhode Island, that in 1642, Woodword and Saffrey had ascertained the point, three miles south of Charles river; which, by the charters of both colonies, was to form their common boundary by a line to run east and west therefrom. That Woodword and Saffrey had set up a stake at that point on Wrentham Plains, as the true southern boundary of Massachusetts. That the Rhode Island commissioners, confiding in such representation, believing that such point had been truly ascertained, and that such stake was no more than three miles from Charles river, south; entered into and made the agreement of 1710–11, which was executed by the commissioners on both sides.

In the agreement is this clause: That the, stake set up by Woodword and Saffrey, approved artists, in 1642, and since that often renewed, in lat. 41° 55' N., being three English miles south of Charles river, in its southernmost part, agreeably to the letters patent to Massachusetts, be accounted and allowed as the commencement of the line between the colonies, and continued between them as decyphered in the plan of Woodword and Saffrey, on record in the Massachusetts government.

It is then averred in the bill, that no mark stake, or monument then existed (1710–11) by which the place at which Woodword and Saffrey were alleged to have set up the stake could be ascertained; that

none of the parties to the agreement went to such place; that no survey was made, no line run, or any means taken to ascertain where it was; whether it was three miles or more from Charles river; whether Woodword and Saffrey ever run the line, or whether it was the true boundary line between the colonies, according to their respective charters. That Massachusetts took wrongful possession of the territory in question, in which Rhode Island never acquiesced, and to which she never agreed; but continued to assert her claim from the time of the agreement, to the filing of the bill, to all the territory embraced in her charter, and sovereignty and jurisdiction within and over it, as claimed in the bill. The bill denies that any line was ever run by Woodword and Saffrey, in 1642; avers that the agreements of 1710–11, which adopted it, were unfair, inequitable, executed under a misrepresentation and mistake as to material facts; that the line is not run according to the charters of the colonies; that it is more than seven miles south of the southernmost part of Charles river; that the agreement was made without the assent of the king; that Massachusetts has continued to hold wrongful possession of the disputed territory, and prevents the exercise of the rightful jurisdiction and sovereignty of Rhode Island therein. The prayer of the bill is to ascertain and establish the northern boundary between the states, that the rights of sovereignty and jurisdiction be restored and confirmed to the plaintiffs, and they be quieted in the enjoyment thereof, and their title; and for other and further relief.

On the service of this bill on the governor and attorney general of Massachusetts, agreeably to a rule of this Court, the legislature passed a resolution, authorizing the appearance of the state to the suit, and the employment of counsel by the governor, to defend the rights of the state. In obedience to this resolution the governor, after reciting it, appointed counsel under the seal of the state, to appear and make defence; either by objecting to the jurisdiction of this Court, or by plea, answer or otherwise, at his discretion, as he should judge most proper.

Under this authority, an appearance was entered; and at January term, a plea in bar of the plaintiff's bill was filed, in which it was averred: That in 1642, a station or monument was erected and fixed at a point believed to be on the true southern boundary line of Massachusetts, and a line continued therefrom to the Connecticut river, westwardly; which station or monument was well known, notorious, and has ever since been called Woodword and Saffrey's

station, on Wrentham Plains. It then sets up the agreement of 1709, and subsequent proceedings at large; avers that the whole merits of plaintiff's case, as set forth in the bill, were fully heard, tried, and determined, in the hearing and by the judgment of the Rhode Island commissioners; that the agreement was fair, legal, and binding between the parties; that it was a valid and effectual settlement of the matter in controversy; without cover, fraud, or misrepresentation, with a full and equal knowledge of all circumstances by both parties. That such agreement is still in full force, no way waived, abandoned, or relinquished; and that the defendant has held, possessed, occupied, and enjoyed the land, propriety, and jurisdiction, according to the well known and easily discovered station of Woodword and Saffrey, and the line run by them therefrom, from the date of the agreement to the present time, wihout hindrance or molestation.

The plea then sets forth the subsequent agreement of the two colonies, in 1717 and 1718, touching their boundaries, and a running and marking thereof by their respective commissioners, appointed for the purpose of finally settling the controversy; who, in 1718 agreed that the stake of Woodword and Saffrey, should be the point from which the dividing line should be run, and be forever the boundary between the two governments; notwithstanding any former controversy or claim. That this agreement was recorded, ratified, and confirmed by the general assembly of Rhode Island; that no false representation was made to their commissioners; that the agreement was concluded fairly, in good faith, with full and equal knowledge by the respective parties, has never been annulled, rescinded or abandoned, and was in pursuance and completion of the agreement of 1709. The report of the commissioners is then set out, stating that in 1719 they run and marked a line west, 2° south from the stake of Woodword and Saffrey, at which they met, as the boundary; which report was approved by Rhode Island in the same year. The plea then makes the same averment as to these proceedings of 1717, 1718, and 1719, as it did in relation to those of 1709, 1710, and 1711; pleads both agreements and unmolested possession by the defendant, from their respective dates to the present time, as a bar to the whole bill, and against any other or further relief therein; prays the judgment of the Court whether the defendant shall make any further answer to the bill, and to be dismissed.

Then the defendant, not waiving, but relying on his plea, by way

of answer and in support of the plea as a bar to the bill, avers that both agreements were a valid and effectual settlement of the whole matter of controversy in the case, as is insisted on in the plea.

To this plea a replication was put in, but afterwards withdrawn, and notice given that the cause would be put down for hearing on the plea: the cause was continued at the last term; the plaintiff gave notice that he should at this term move to amend the bill; and the case is now before us for consideration, on a motion by the defendant, to dismiss the bill for want of jurisdiction in the cause.

However late this objection has been made, or may be made in any cause, in an inferior or appellate court of the United States, it must be considered and decided, before any court can move one further step in the cause; as any movement is necessarily the exercise of jurisdiction. Jurisdiction is the power to hear and determine the subject matter in controversy between parties to a suit, to adjudicate or exercise any judicial power over them; the question is, whether on the case before a court, their action is judicial or extra-judicial; with or without the authority of law, to render a judgment or decree upon the rights of the litigant parties. If the law confers the power to render a judgment or decree, then the court has jurisdiction; what shall be adjudged or decreed between the parties, and with which is the right of the case, is judicial action, by hearing and determining it. 6 Peters, 709; 4 Russell, 415; 3 Peters, 203–7.

A motion to dismiss a cause pending in the courts of the United States, is not analogous to a plea to the jurisdiction of a court of common law or equity in England; there the superior courts have a general jurisdiction over all persons within the realm, and all causes of action between them. It depends on the subject matter, whether the jurisdiction shall be exercised by a court of law or equity; but that court, to which it appropriately belongs, can act judicially upon the party and the subject of the suit; unless it shall be made apparent to the court that the judicial determination of the case has been withdrawn from the court of general jurisdiction, to an inferior and limited one. It is a necessary presumption that the court of general jurisdiction can act upon the given case, when nothing appears to the contrary; hence has arisen the rule that the party claiming an exemption from its process, must set out the reasons by a special plea in abatement; and show that some inferior court of law or equity has the exclusive cognizance of the case; otherwise the superior court must proceed, in virtue of its general

[The State of Rhode Island v. The State of Massachusetts.]

jurisdiction. This rule prevails both at law and in equity. 1 Ves. sen. 204; 2 Ves. sen. 307; Mit. 183. A motion to dismiss, therefore, cannot be entertained, as it does not and cannot disclose a case of exception; and if a plea in abatement is put in, it must not only make out the exception, but point to the particular court to which the case belongs. A plaintiff in law or equity, is not to be driven from court to court by such pleas; if a defendant seeks to quash a writ, or dismiss a bill for such cause, he must give the plaintiff a better one, and shall never put in a second plea to the jurisdiction of that court, to which he has driven the plaintiff by his plea. 1 Ves. sen. 203. There are other classes of cases where the objection to the jurisdiction is of a different nature, as on a bill in chancery; that the subject matter is cognizable only by the king in council, and not by any judicial power, 1 Ves. sen. 445; or that the parties, defendant, cannot be brought before any municipal court, on account of their sovereign character, and the nature of the controversy; as 1 Ves. jr. 371, 387; 2 Ves. jr. 56, 60; or in the very common cases which present the question, whether the cause properly belongs to a court of law or equity. To such cases, a plea in abatement would not be applicable, because, the plaintiff could not sue in an inferior court; the objection goes to a denial of any jurisdiction of a municipal court in one class of cases; and to the jurisdiction of any court of equity or of law in the other: on which last, the court decides according to their legal discretion. An objection to jurisdiction, on the ground of exemption from the process of the court in which the suit is brought, or the manner in which a defendant is brought into it, is waived by appearance and pleading to issue. 10 Peters, 473; Toland v. Sprague, 12 Peters, 300; but when the objection goes to the power of the court over the parties, or the subject matter, the defendant need not, for he cannot give the plaintiff a better writ or bill. Where no inferior court can have jurisdiction of a case in law or equity, the ground of the objection is not taken by plea in abatement, as an exception of the given case, from the otherwise general jurisdiction of the court; appearance does not cure the defect of judicial power; and it may be relied on by plea, answer, demurrer, or at the trial or hearing, unless it goes to the manner of bringing the defendant into court, which is waived by submission to the process.

As a denial of jurisdiction over the subject matter of a suit between parties within the realm, over which and whom the court has power to act, cannot be successful in an English court of general ju-

risdiction; a motion like the present could not be sustained consistently with the principles of its constitution. But as this Court is one of limited and special original jurisdiction, its action must be confined to the particular cases, controversies, and parties over which the constitution and laws have authorized it to act; any proceeding without the limits prescribed, is coram non judice, and its action a nullity. 10 Peters, 474; S. P. 4 Russ. 415. And whether the want or excess of power is objected by a party, or is apparent to the Court, it must surcease its action, or proceed extra-judicially.

Before we can proceed in this cause we must, therefore, inquire whether we can hear and determine the matters in controversy between the parties, who are two states of this Union, sovereign within their respective boundaries, save that portion of power which they have granted to the federal government, and foreign to each other for all but federal purposes. So they have been considered by this Court, through a long series of years and cases, to the present term; during which, in the case of The Bank of the United States v. Daniels, this Court has declared this to be a fundamental principle of the constitution; and so we shall consider it in deciding on the present motion. 2 Peters, 590, 91.

Those states, in their highest sovereign capacity, in the convention of the people thereof; on whom, by the revolution, the prerogative of the crown, and the transcendant power of parliament devolved, in a plenitude unimpaired by any act, and controllable by no authority, 6 Wheat. 651; 8 Wheat. 584, 88; adopted the constitution, by which they respectively made to the United States a grant of judicial power over controversies between two or more states. By the constitution, it was ordained that this judicial power, in cases where a state was a party, should be exercised by this Court as one of original jurisdiction. The states waived their exemption from judicial power, 6 Wheat. 378, 80, as sovereigns by original and inherent right, by their own grant of its exercise over themselves in such cases, but which they would not grant to any inferior tribunal. By this grant, this Court has acquired jurisdiction over the parties in this cause, by their own consent and delegated authority; as their agent for executing the judicial power of the United States in the cases specified. Massachusetts has appeared, submitted to the process in her legislative capacity, and plead in bar of the plaintiff's action, certain matters on which the judgment of the Court is asked; all doubts as to jurisdiction over the parties are thus at rest, as well

by the grant of power by the people, as the submission of the legislature to the process; and calling on the Court to exercise its jurisdiction on the case presented by the bill, plea, and answer.

Our next inquiry will be, whether we have jurisdiction of the subject matters of the suit, to hear and determine them.

That it is a controversy between two states, cannot be denied; and though the constitution does not, in terms, extend the judicial power to all controversies between two or more states, yet it in terms excludes none, whatever may be their nature or subject. It is, therefore, a question of construction, whether the controversy in the present case is within the grant of judicial power. The solution of this question must necessarily depend on the words of the constitution; the meaning and intention of the convention which framed and proposed it for adoption and ratification to the conventions of the people of and in the several states; together with a reference to such sources of judicial information as are resorted to by all courts in construing statutes, and to which this Court has always resorted in construing the constitution. It was necessarily left to the legislative power to organize the Supreme Court, to define its powers consistently with the constitution, as to its original jurisdiction; and to distribute the residue of the judicial power between this and the inferior courts, which it was bound to ordain and establish, defining their respective powers, whether original or appellate, by which and how it should be exercised. In obedience to the injunction of the constitution, congress exercised their power, so far as they thought it necessary and proper, under the seventeenth clause of the eighth section, first article, for carrying into execution the powers vested by the constitution in the judicial, as well as all other departments and officers of the government of the United States. 3 Wheat. 389. No department could organize itself; the constitution provided for the organization of the legislative power, and the mode of its exercise, but it delineated only the great outlines of the judicial power; 1 Wheat. 326; 4 Wheat. 407: leaving the details to congress, in whom was vested, by express delegation, the power to pass all laws necessary and proper for carrying into execution all powers except their own. The distribution and appropriate exercise of the judicial power, must therefore be made by laws passed by congress, and cannot be assumed by any other department; else, the power being concurrent in the legislative and judicial departments, a conflict between them would be probable, if not unavoidable, under a constitution of go-

[The State of Rhode Island v. The State of Massachusetts.]

vernment which made it the duty of the judicial power to decide all cases in law or equity arising under it, or laws passed, and treaties made by its authority.

By the judiciary act of 1789, the judicial system of the United States was organized, the powers of the different courts defined, brought into action, and the manner of their exercise regulated. The 13th section provided, "That the Supreme Court shall have exclusive jurisdiction of all controversies of a civil nature, where a state is a party, except between a state and its citizens; and except also between a state and citizens of other states or aliens; in which latter case, it shall have original, but not exclusive jurisdiction." 1 Story's Laws, 59.

The power of congress to make this provision for carrying into execution the judicial power in such cases, has never been, and we think cannot be questioned; and taken in connection with the constitution, presents the great question in this cause, which is one of construction appropriate to judicial power, and exclusively of judicial cognizance, till the legislative power acts again upon it. Vide 3 Peters, 203. In deciding whether the present case is embraced or excluded by the constitution and judiciary act, and whether it is a case of lawful original cognizance by this Court, it is the exercise of jurisdiction; for it must be in the legal discretion of the Court, to retain or dismiss the bill of the plaintiffs. Act as we may feel it our duty to do, there is no appeal from our judgment, save to the amending power of the constitution; which can annul not only its judgments, but the Court itself. So that the true question is necessarily, whether we will so exercise our jurisdiction as to give a judgment on the merits of the case as presented by the parties, who are capable of suing and being sued in this Court, in law or equity, according to the nature of the case, and controversy between the respective states.

This Court, in construing the constitution as to the grants of powers to the United States, and the restrictions upon the states, has ever held, that an exception of any particular case, presupposes that those which are not excepted are embraced within the grant or prohibition: and have laid it down as a general rule, that where no exception is made in terms, none will be made by mere implication or construction. 6 Wh. 378; 8 Wh. 489, 490; 12 Wh. 438; 9 Wh. 206, 207, 216.

Then the only question is, whether this case comes within the rule.

or presents an exception, according to the principles of construc-
tion adopted and acted on by this Court, in cases involving the expo-
sition of the constitution and laws of the United States, which are
construed as other instruments granting power or property. 12
Wh. 437; 6 Peters, 738, 740. That some degree of implication
must be given to words, is a proposition of universal adoption: im-
plication is but another term for meaning and intention, apparent in
the writing, on judicial inspection; "the evident consequence," 1
Bl. Com. 250; "or some necessary consequence resulting from the
law," 2 Ves. sen. 351; or the words of an instrument; in the con-
struction of which, the words, the subject, the context, the inten-
tion of the person using them, are all to be taken into view. 4 Wh.
415; 6 Peters, 739, 741. Such is the sense in which the common
expression is used in the books, "express words or necessary impli-
cation," such as arise on the words, taken in connection with other
sources of construction; but not by conjecture, supposition, or mere
reasoning on the meaning or intention of the writing. All rules
would be subverted if mere extraneous matter should have the effect
of interpreting a supreme law, differently from its obvious or neces-
sarily to be implied sense: Vide 9 Wh. 188, &c.; so apparent as to
overrule the words used; 6 Wh. 380. "Controversies between two
or more states," "all controversies of a civil nature, where a state is
a party;" are broad comprehensive terms; by no obvious meaning
or necessary implication, excluding those which relate to the title,
boundary, jurisdiction, or sovereignty of a state. 6 Wh. 378.

The judiciary act makes certain exceptions, which apply only to
cases of private persons, and cannot embrace a case of state against
state; established rules forbid the extension of the exception to such
cases, if they are of a civil nature. What then are "controversies
of a civil nature," between state and state, or more than two states?

We must presume that congress did not mean to exclude from our
jurisdiction those controversies, the decision of which the states had
confided to the judicial power, and are bound to give to the consti-
tution and laws such a meaning as will make them harmonize, un-
less there is an apparent or fairly to be implied conflict between
their respective provisions. In the construction of the constitution,
we must look to the history of the times, and examine the state of
things existing when it was framed and adopted, 12 Wh. 354; 6
Wh. 416; 4 Peters, 431–2; to ascertain the old law, the mischief
and the remedy. It is a part of the public history of the United

States, of which we cannot be judicially ignorant, that at the adoption of the constitution, there were existing controversies between eleven states respecting their boundaries, which arose under their respective charters, and had continued from the first settlement of the colonies. New Hampshire and New York contended for the territory which is now Vermont, until the people of the latter assumed by their own power the position of a state, and settled the controversy, by taking to themselves the disputed territory, as the rightful sovereign thereof. Massachusetts and Rhode Island are now before us; Connecticut claimed part of New York and Pennsylvania. She submitted to the decree of the council of Trenton, acting pursuant to the authority of the confederation, which decided that Connecticut had not the jurisdiction; but she claimed the right of soil till 1800. New Jersey had a controversy with New York, which was before this Court in 1832; and one yet subsists between New Jersey and Delaware. Maryland and Virginia were contending about boundaries in 1835, when a suit was pending in this Court; and the dispute is yet an open one. Virginia and North Carolina contended for boundary till 1802; and the remaining states, South Carolina and Georgia, settled their boundary in the April preceding the meeting of the general convention, which framed and proposed the constitution. 1 Laws U. S. 466. With the full knowledge that there were at its adoption, not only existing controversies between two states singly, but between one state and two others, we find the words of the constitution applicable to this state of things, "controversies between two or more states." It is not known that there were any such controversies then existing, other than those which relate to boundary; and it would be a most forced construction to hold that these were excluded from judicial cognizance, and that it was to be confined to controversies to arise prospectively on other subjects. This becomes the more apparent, when we consider the context and those parts of the constitution which bear directly on the boundaries of states; by which it is evident, that there remained no power in the contending states to settle a controverted boundary between themselves, as states competent to act by their own authority on the subject matter, or in any department of the government, if it was not in this.

By the first clause of the tenth section of the first article of the constitution, there was a positive prohibition against any state entering into " any treaty, alliance, or confederation:" no power under the

government could make such an act valid, or dispense with the constitutional prohibition. In the next clause is a prohibition against any state entering " into any agreement or compact with another state, or with a foreign power, without the consent of congress; or engaging in war, unless actually invaded, or in imminent danger, admitting of no delay." By this surrender of the power. which before the adoption of the constitution was vested in every state, of settling these contested boundaries, as in the plenitude of their sovereignty they might; they could settle them neither by war, or in peace, by treaty, compact or agreement, without the permission of the new legislative power which the states brought into existence by their respective and several grants in conventions of the people. If congress consented, then the states were in this respect restored to their original inherent sovereignty; such consent being the sole limitation imposed by the constitution, when given, left the states as they were before, as held by this Court in Poole v. Fleeger, 11 Peters, 209; whereby their compacts became of binding force, and finally settled the boundary between them; operating with the same effect as a treaty between sovereign powers. That is, that the boundary so established and fixed by compact between nations, become conclusive upon all the subjects and citizens thereof, and bind their rights; and are to be treated to all intents and purposes, as the true real boundaries. 11 Peters, 209; S. P. 1 Ves. sen. 448, 9; 12 Wheat. 534. The construction of such compact is a judicial question, and was so considered by this Court in the Lessee of Sims v. Irvine, 3 Dall. 425–54; and in Marlatt v. Silk & M'Donald, 11 Peters, 2, 18; Barton v. Williams, 3 Wheat. 529–33, &c.

In looking to the practical construction of this clause of the constitution, relating to agreements and compacts by the states, in submitting those which relate to boundaries to congress for its consent, its giving its consent, and the action of this Court upon them; it is most manifest, that by universal consent and action, the words " agreement" and " compact," are construed to include those which relate to boundary; yet that word boundary is not used. No one has ever imagined that compacts of boundary were excluded, because not expressly named; on the contrary, they are held by the states, congress, and this Court, to be included by necessary implication; the evident consequence resulting from their known object, subject matter, the context, and historical reference to the state of the times and country. No such exception has been thought of, as it would

render the clause a perfect nullity for all practical purposes; espe-cially the one evidently intended by the constitution, in giving to congress the power of dissenting to such compacts. Not to prevent the states from settling their own boundaries, so far as merely af-fected their relations to each other, but to guard against the derange-ment of their federal relations with the other states of the Union, and the federal government; which might be injuriously affected, if the contracting states might act upon their boundaries at their plea-sure.

Every reason which has led to this construction, applies with equal force to the clause granting to the judicial power jurisdiction over controversies between states, as to that clause which relates to com-pacts and agreements: we cannot make an exception of controversies relating to boundaries, without applying the same rule to compacts for settling them; nor refuse to include them within one general term, when they have uniformly been included in another. Con-troversies about boundary, are more serious in their consequences upon the contending states, and their relations to the Union and governments, than compacts and agreements. If the constitution has given to no department the power to settle them, they must remain interminable; and as the large and powerful states can take possession to the extent of their claim, and the small and weak ones must ac-quiesce and submit to physical power; the possession of the large state must consequently be peaceable and uninterrupted; prescrip-tion will be asserted, and whatever may be the right and justice of the controversy, there can be no remedy, though just rights may be violated. Bound hand and foot by the prohibitions of the constitu-tion, a complaining state can neither treat, agree, or fight with its adversary, without the consent of congress: a resort to the judicial power is the only means left for legally adjusting, or persuading a state which has possession of disputed territory, to enter into an agreement or compact, relating to a controverted boundary. Few, if any, will be made, when it is left to the pleasure of the state in pos-session; but when it is known that some tribunal can decide on the right, it is most probable that controversies will be settled by com-pact.

There can be but two tribunals under the constitution who can act on the boundaries of states, the legislative or the judicial power; the former is limited in express terms to assent or dissent, where a com-pact or agreement is referred to them by the states; and as the latter

can be exercised only by this Court, when a state is a party, the power is here, or it cannot exist. For these reasons we cannot be persuaded that it could have been intended to provide only for the settlement of boundaries, when states could agree; and to altogether withhold the power to decide controversies on which the states could not agree, and presented the most imperious call for speedy settlement.

There is another clause in the constitution which bears on this question. The judicial power extends to "controversies between citizens of different states;" "between citizens of the same state claiming lands under grants of different states." We cannot but know, judicially, that the latter classes of cases must necessarily arise on boundary; and that few if any ever arise from any other source. If there is a compact between the states, it settles the line of original right; it is the law of the case binding on the states and its citizens, as fully as if it had been never contested; if there is no compact, then the controversy must be settled, by adjudging where the line of boundary ought to be, by the laws and rules appropriate to the case. 6 Wheat. 393; 2 Peters, 300. It is not recollected that any such cases have ever arisen, "between citizens of the same state," as the judiciary acts have made no provision for this exercise of this undoubted constitutional jurisdiction; and it is not necessary for the decision of this cause, to inquire whether a law is necessary for this purpose. But for the other class of cases " controversies between citizens of different states," the eleventh section of the judiciary act makes provision; and the circuit courts in their original, and this Court in its appellate jurisdiction, have decided on the boundaries of the states, under whom the parties respectively claim; whether there has been a compact or not. The jurisdiction of the circuit court in such cases was distinctly and expressly asserted by this Court as early as 1799, in Fowler v. Miller, 3 Dall. 411–12; S. P. 5 Peters, 290. In Handly's Lessee v. Anthony, the circuit court of Kentucky decided on the boundary between that state and Indiana, in an ejectment between these parties; and their judgment was affirmed by this Court. 5 Wheat. 375; 3 Wheat. 212–18; S. P. Harcourt v. Gaillard, 12 Wheat. 523. When the boundaries of states can be thus decided collaterally in suits between individuals, we cannot, by any just rule of interpretation, declare that this Court cannot adjudicate on the question of boundary, when it is presented directly in a controversy between two or more states, and is the only point in the cause.

There is yet another source of reference, from which to ascertain the true construction of the constitution.

By the ninth article of confederation adopted by the legislatures of the several states, it is provided, "That the United States in congress assembled, shall also be the last resort on appeal, in all disputes and differences now subsisting, or which may hereafter arise between two or more states, concerning boundary, jurisdiction, or any other cause whatever." It directed the appointment of a tribunal, whose judgment should be final and conclusive. It also gave to congress power to appoint a judicial tribunal to decide on a petition of either of the parties, claiming land under grants of two or more states, who had adjusted their boundaries, but had previously made the grants on which the controversy arose. One of the most crying evils of the confederation was, that it created no judicial power without the action of congress; and confined the power of that body to the appointment of courts for the trial of piracies and felonies committed on the high seas; for determining finally on appeal, in all cases of captures; and for the adjustment of the controversies before referred to. Yet defective as was the confederation in other respects, there was full power to finally settle controverted boundaries in the two cases, by an appeal by a state, or petition of one of its citizens. This power was given from the universal conviction of its necessity, in order to preserve harmony among the confederated states; even during the pressure of the revolution. If in this state of things, it was deemed indispensable to create a special judicial power, for the sole and express purpose of finally settling all disputes concerning boundary, arise how they might; when this power was plenary, its judgment conclusive on the right; while the other powers delegated to congress, were mere shadowy forms, one conclusion at least is inevitable. That the constitution which emanated directly from the people, in conventions in the several states, could not have been intended to give to the judicial power a less extended jurisdiction, or less efficient means of final action, than the articles of confederation adopted by the mere legislative power of the states, had given to a special tribunal appointed by congress, whose members were the mere creatures and representatives of state legislatures, appointed by them, without any action by the people of the state. This Court exists by a direct grant from the people, of their judicial power; it is exercised by their authority, as their agent selected by themselves, for the purposes specified; the people of the states as they respec-

[The State of Rhode Island v. The State of Massachusetts.]

tively became parties to the constitution, gave to the judicial power of the United States, jurisdiction over themselves, controversies between states, between citizens of the same or different states, claiming lands under their conflicting grants, within disputed territory. No fact was more prominent in our history, none could have been more strongly impressed on the members of the general and state conventions, than that contests for the vacant lands of the crown, long threatened the dissolution of the confederation, which existed practically and by common consent, from 1774 to 1781; when, after five years of discussion, it was ratified by the legislatures of all the states. This Court has attested the fact, 6 Cranch, 142; 5 Wheat. 376. Similar danger was imminent, from controversies about boundaries between the states, till provision was made for their decision, with a proviso, "That no state should be deprived of territory for the benefit of the United States." 1 Laws U. S. 17. These two provisions taken in connection, put an end to any fears of convulsion, by the contests of states about boundary and jurisdiction, when any state could, by appeal, bring the powers of congress and a judicial tribunal into activity; and the United States could not take any vacant land within the boundary of a state. Hence resulted the principles laid down by this Court in Harcourt and Gaillard, 12 Wheat. 526, that the boundaries of the United States were the external boundaries of the several states; and that the United States did not acquire any territory by the treaty of peace, in 1783.

Yet though this express provision was made to settle controverted boundaries by judicial power, congress had no supervision over compacts and agreements between states as to boundary, save on grants made before the compact; the states did, and could so settle them without the consent of congress, to whom, as no express power on or over the subject of such compacts was delegated, their dissent could not invalidate them. Such was the law of the confederacy during a common war, when external danger could not suppress the danger of dissolution from internal dissentions; when owing to the imbecility of congress, the powers of the states being reserved for legislative and judicial purposes, and the utter want of power in the United States to act directly on the people of the states, on the rights of the states (except those in controversy between them) or the subject matters, on which they had delegated but mere shadowy jurisdiction, a radical change of government became necessary. The constitution, which superseded the articles of confederation, erected

a new government, organized it into distinct departments, assigning to each its appropriate powers, and to congress the power to pass laws for carrying into execution the powers granted to each; so that the laws of the Union could be enforced by its own authority, upon all persons and subject matters, over which jurisdiction was granted to any department, or officer of the government of the United States. It was to operate in a time of peace with foreign powers, when foreign pressure was not in itself some bond of union between the states, and danger from domestic sources might be imminent; to extend the legislative, executive and judicial power, alike over persons and states, on the enumerated subjects by their own grants. The states submitted to its exercise, waived their sovereignty, and agreed to come to this Court to settle their controversies with each other, excepting none in terms. So they had agreed by the confederation; not only not excepting, but in express terms including, all disputes and differences whatever.

In the front of the constitution is a declaration by the sovereign power from which it emanated; that it was ordained, " in order to form a more perfect union, establish justice, insure domestic tranquillity," &c. Whether it was best calculated to effect these objects by making the judicial power utterly incompetent to exercise a jurisdiction expressly delegated to the old congress and its constituted court, over states and their boundaries, in the plenitude of absolute power, yet granted only by the legislative power of the several states; or whether the powers granted to this Court by the people of all the states, ought, by mere construction and implication, to be held inefficient for the objects of its creation, and not capable of " establishing justice" between two or more states; are the direct questions before us for consideration. Without going further into any general consideration on the subject, there is one which cannot be overlooked, and is imperious in its results.

Under the confederation, the states were free to settle their controversies of any kind whatever by compact or agreement; under the constitution they can enter into none without the consent of congress, in the exercise of its political power; thus making an amicable adjustment a political matter for the concurring determination of the states and congress, and its construction a matter of judicial cognizance by any court to which the appropriate resort may be had, by the judiciary act.

This has uniformly been done in the courts of the states, and

[The State of Rhode Island v. The State of Massachusetts.]

Union; no one has ever deemed such an exercise of power to be extra-judicial, or a case which called for it to be coram non judice. When, therefore, the court judicially inspects the articles of confederation, the preamble to the constitution, together with the surrender, by the states, of all power to settle their contested boundaries, with the express grant of original jurisdiction to this Court; we feel not only authorized, but bound to declare that it is capable of applying its judicial power, to this extent at least: 1. To act as the tribunal substituted by the constitution in place of that which existed at the time of its adoption, on the same controversies, and to a like effect. 2. As the substitute of the contending states, by their own grant, made in their most sovereign capacity, conferring that pre-existing power, in relation to their own boundaries, which they had not surrendered to the legislative department; thus separating the exercise of political from judicial power, and defining each.

There is but one power in this Union paramount to that by which, in our opinion, this jurisdiction has been granted, and must be brought into action if it can. That power has been exerted in the 11th amendment: but while it took from this Court all jurisdiction, past, present, and future, 3 Dall. 382, of all controversies between states and individuals; it left its exercise over those between states as free as it had been before. This, too, with the full view of the decisions of this Court, and the act of 1789, giving it exclusive jurisdiction of all controversies of a civil nature, where a state is a party; and there can be no subject on which the judicial power can act with a more direct and certain tendency, to effectuate the great objects of its institution, than the one before us. If we cannot "establish justice" between these litigant states, as the tribunal to which they have both submitted the adjudication of their respective controversies, it will be a source of deep regret to all who are desirous that each department of the government of the Union should have the capacity of acting within its appropriate orbit, as the instrument appointed by the constitution, so to execute its agency as to make this bond of union between the states more perfect, and thereby enforce the domestic tranquillity of each and all.

Being thus fully convinced that we have an undoubted jurisdiction of this cause, as far as we have proceeded in examining whether, by a true and just construction of the constitution and laws, it is included or excluded, in the grant of judicial power, for any purpose;

we now proceed to inquire how that jurisdiction shall be exerted; whether to retain or dismiss the complainant's bill.

This depends on our jurisdiction over any of the matters on which the plaintiff asks our interposition. If there is any one subject on which we can act, the bill must be retained: so that the true inquiry is, not as to the extent, but the existence of any jurisdiction. 1 Ves. sen. 203, 205; 2 Ves. sen. 356.

The bill prays, 1. For the ascertaining and establishing the boundary line between the states, by the order of this Court.

2. That the right of jurisdiction and sovereignty of the plaintiff to the disputed territory may be restored to her, and she be quieted in the enjoyment thereof, and her title thereto; and for further relief. If we can decree any relief specially called for, or any other relief, consistently with the specific prayer, we must proceed in the cause. 10 Pet. 228; 8 Pet. 536.

The first prayer is, to ascertain and establish a boundary. Having expressed our opinion that the subject of boundary is within our jurisdiction, we must exercise it to some extent, and on some matter connected with, or dependent upon it; and as the bill is on the equity side of the Court, it must be done according to the principles and usages of a court of equity.

In the bill are set forth various charters from the crown, from 1621, to 1691, and sundry proceedings by the grantees and the crown, in relation thereto; also agreements between the parties as colonies and states, for adjusting their boundaries, and the proceedings of their respective legislatures and commissioners, in relation thereto, from 1709, to 1818. The plaintiff relies on the charters of the two colonies, as the rule by which to settle the boundary; on the continued assertion of her rights, as well by the charter, as her previous purchase from the Indians: denying altogether the validity of the agreements and subsequent proceedings; averring that they were made under misrepresentation and mistake, as to material facts. On the other hand, the defendant pleads the agreements as a bar; that they are binding, and have been ratified by the plaintiff: so that the plaintiff rests his case on a question of original boundary, unaffected by any agreement; the defendant rests on the agreements, without regard to the original charter boundaries. One asking us to annul, the other to enforce the agreements; one averring continual claim, the other setting up the quiet, unmolested possession for more than a century, in strict conformity to, and by the line in the agreements.

[The State of Rhode Island v. The State of Massachusetts.]

Our first inquiry then must be, as to our power to settle the boundary; in other words, to decide what portion of the territory in dispute belongs to the one state or the other, according to the line which is their common boundary. There is not in fact, or by any law can be, any territory which does not belong to one or the other state; so that the only question is, to which the territory belongs. This must depend on the right by which each state claims the territory in question. Both claim under grants of contiguous territory, by the king, in whom was the absolute propriety and full dominion in and over it; 9 Peters, 745, to 748; 8 Wheat. 595; the line drawn, or pointed out in his grant, is therefore that which is designated in the two charters as the common boundary of both. 5 Wheat. 375.

The locality of that line is matter of fact, and, when ascertained separates the territory of one from the other; for neither state can have any right beyond its territorial boundary. It follows, that when a place is within the boundary, it is a part of the territory of a state; title, jurisdiction, and sovereignty, are inseparable incidents, and remain so till the state makes some cession. The plain language of this Court in The United States v. Bevans, 3 Wheat. 386, et seq., saves the necessity of any reasoning on this subject. The question is put by the Court—"What then is the extent of jurisdiction which a state possesses?" "We answer, without hesitation, the jurisdiction of a state is coextensive with its territory, coextensive with its legislative power. The place described, is unquestionably within the original territory of Massachusetts. It is, then, within the jurisdiction of Massachusetts, unless that jurisdiction has been ceded to (" by") the United States, Ib. 387." "A cession of territory is essentially a cession of jurisdiction, Ib. 388. Still the general jurisdiction over the place, subject to this grant of power, (to the United States,) adheres to the territory as a portion of sovereignty not yet given away." Ib. 389.

This principle is embodied in the sixteenth clause of the eighth section, first article of the constitution, relative to this district; forts, arsenals, dock yards, magazines; and uniformly applied to all acquisitions of territory by the United States, in virtue of cessions by particular states, or foreign nations. 5 Wheat. 324; 5 Wheat. 375; 3 Wheat. 388, 89; 2 Peters, 300, &c. Title, jurisdiction, sovereignty, are therefore dependent questions, necessarily settled when boundary is ascertained, which being the line of territory, is the

line of power over it: so that great as questions of jurisdiction and sovereignty may be, they depend in this case on two simple facts. 1. Where is the southernmost point of Charles river. 2. Where is the point, three English miles in a south line, drawn from it. When these points are ascertained, which by the terms are those called for in both charters; then an east and west line from the second point, is necessarily the boundary between the two states, if the charters govern it.

If this Court can, in a case of original jurisdiction, where both parties appear, and the plaintiff rests his case on these facts, proceed to ascertain them; there must be an end of this cause when they are ascertained. if the issue between them is upon original right by the charter boundaries. We think it does not require reason or precedent, to show that we may ascertain facts with or without a jury, at our discretion, as the circuit courts, and all others do, in the ordinary course of equity: our power to examine the evidence in the cause, and thereby ascertain a fact, cannot depend on its effects, however important in their consequences. Whether the sovereignty of the United States, of a state, or the property of an individual, depends on the locality of a tree, a stone, or water-course; whether the right depends on a charter, treaty, cession, compact, or a common deed; the right is to territory great or small in extent, and power over it, either of government or private property; the title of a state is sovereignty, full and absolute dominion; 2 Peters, 300, 301; the title of an individual such as the state makes it by its grant and law

No court acts differently in deciding on boundary between states, than on lines between separate tracts of land: if there is uncertainty where the line is, if there is a confusion of boundaries by the nature of interlocking grants, the obliteration of marks, the intermixing of possession under different proprietors, the effects of accident, fraud, or time, or other kindred causes, it is a case appropriate to equity. An issue at law is directed, a commission of boundary awarded; or, if the court are satisfied without either, they decree what and where the boundary of a farm, a manor, province, or a state, is and shall be.

When no other matter affects a boundary, a decree settles it as having been by original right at the place decreed; in the same manner as has been stated where it is settled by treaty or compact; all dependent rights are settled when boundary is; 1 Ves. sen., 448 to 450. If, therefore, there was an issue in this case, on the locality of the point three miles south of the southernmost point of Charles river, we

[The State of Rhode Island v. The State of Massachusetts.]

should be competent to decide it; and decree where the boundary between the states was in 1629, and 1663, at the dates of their respective charters.

On these principles, it becomes unnecessary to decide on the remaining prayers of the bill; if we grant the first, and settle boundary; the others follow; and if the plaintiff obtains relief as to that, he wants no other. The established forms of such decrees extend to every thing in manner or way necessary to the final establishment of the boundary, as the true line of right and power between the parties.

This, however, is not a case where there is an issue on original boundary; the defendant does not rest on that fact, but puts in a plea setting up an agreement or compact of boundary between the parties while colonies, and the actual establishment of a line agreed on, run, marked, and ratified by both colonies, long possession, and a right by prescription to all the territory north of such line. This presents a case on an agreement on one side, alleged to be conclusive upon every matter complained of in the bill; on the other, to be invalid for the reasons alleged. If this matter of the plea is sufficient in law, and true in fact, it ends the cause; if not so in both respects, then the parties are thrown back on their original rights, according to their respective claims to the territory in question; by charters, or purchase from the Indians. If, then, we can act at all on the case, we must, on this state of the pleadings, decide on the legal sufficiency of the plea, if true, as on a demurrer to it; next, on the truth of its averments; and then decide whether it bars the complaint of the plaintiff, and all relief: if it does not, then we must ascertain the fact on which the whole controversy turns. In the first aspect of the case, it presents a question of the most common and undoubted jurisdiction of a court of equity; an agreement which the defendant sets up as conclusive to bar all relief, and the plaintiff asks to be declared void, on grounds of the most clear and appropriate cognizance in equity; and not cognizable in a court of law. A false representation made by one party, confided in by the other, as to a fact on which the whole cause depends; the execution of the agreement, and all proceedings under it, founded on a mistaken belief of the truth of the fact represented. We must, therefore, do something in the cause; unless the defendants have, in their objections, made out this to be an exception to the usual course of equity, in its action on questions of boundary.

It is said that this is a political, not civil controversy between the parties; and so not within the constitution, or thirteenth section of the judiciary act.

As it is viewed by the Court, it is on the bill alone, had it been demurred to, a controversy as to the locality of a point three miles south of the southernmost point of Charles river; which is the only question which can arise under the charter. Taking the case on the bill and plea, the question is, whether the stake set up on Wrentham Plain, by Woodword and Saffrey, in 1642, is the true point from which to run an east and west line, as the compact boundary between the states. In the first aspect of the case, it depends on a fact; in the second, on the law of equity, whether the agreement is void or valid: neither of which present a political controversy, but one of an ordinary judicial nature, of frequent occurrence in suits between individuals. This controversy, then, cannot be a political one, unless it becomes so by the effect of the settlement of the boundary; by a decree on the fact, or the agreement; or because the contest is between states as to political rights and power, unconnected with the original, or compact boundary.

We will not impute to the men who conducted the colonies at home, and in congress, in the three declarations of their rights previous to the consummation of the revolution, from 1774, to 1776, and its final act, by a declaration of the rights of the states, then announced to the world; an ignorance of the effects of territorial boundary between them, in both capacities. Every declaration of the old congress would be falsified, if the line of territory is held not to have been, from the first, the line of property and power. The congress, which, in 1777, framed and recommended the articles of confederation for adoption, by the legislative power of the several states; were acting in a spirit of fatuity, if they thought that a final and conclusive judgment on state boundaries, was not equally decisive as to the exercise of political power by a state; making it rightful within, but void beyond the adjudged line.

The members of the general and state conventions, were alike fatuitous, if they did not comprehend, and know the effect of the states submitting controversies between themselves, to judicial power; so were the members of the first congress of the constitution, if they could see, and not know, read, and not understand its plain provisions, when many of them assisted in its frame.

The founders of our government could not but know, what has

[The State of Rhode Island v. The State of Massachusetts.]

ever been, and is familiar to every statesman and jurist, that all controversies between nations, are, in this sense, political, and not judicial, as none but the sovereign can settle them.    In the declaration of independence, the states assumed their equal station among the powers of the earth, and asserted that they could of right do, what other independent states could do; " declare war, make peace, contract alliances;" of consequence, to settle their controversies with a foreign power, or among themselves, which no state, and no power could do for them.    They did contract an alliance with France, in 1778; and with each other, in 1781: the object of both was to defend and secure their asserted rights as states; but they surrendered to congress, and its appointed Court, the right and power of settling their mutual controversies; thus making them judicial questions, whether they arose on " boundary, jurisdiction, or any other cause whatever."    There is neither the authority of law or reason for the position, that boundary between nations or states, is, in its nature, any more a political question, than any other subject on which they may contend.    None can be settled without war or treaty, which is by political power; but under the old and new confederacy they could and can be settled by a court constituted by themselves, as their own substitutes, authorized to do that for states, which states alone could do before.    W   are thus pointed to the true boundary line between political and judicial power, and questions.   A sovereign decides by his own will, which is the supreme law within his own boundary; 6 Peters, 714; 9 Peters, 748; a court, or judge, decides according to the law prescribed by the sovereign power, and that law is the rule for judgment.    The submission by the sovereigns, or states, to a court of law or equity, of a controversy between them, without prescribing any rule of decision, gives power to decide according to the appropriate law of the case; 11 Ves. 294; which depends on the subject matter, the source and nature of the claims of the parties, and the law which governs them.    From the time of such submission, the question ceases to be a political one, to be decided by the sic volo, sic jubeo, of political power; it comes to the court to be decided by its judgment, legal discretion, and solemn consideration of the rules of law appropriate to its nature as a judicial question, depending on the exercise of judicial power; as it is bound to act by known and settled principles of national or municipal jurisprudence, as the case requires.

It has never been contended that prize courts of admiralty juris-

diction, or questions before them, are not strictly judicial; they de-
cide on questions of war and peace, the law of nations, treaties, and
the municipal laws of the capturing nation, by which alone they are
constituted; a fortiori, if such courts were constituted by a solemn
treaty between the state under whose authority the capture was made,
and the state whose citizens or subjects suffer by the capture. All
nations submit to the jurisdiction of such courts over their subjects,
and hold their final decrees conclusive on rights of property. 6 Cr.
284–5.

These considerations lead to the definition of political and judicial
power and questions; the former is that which a sovereign or state
exerts by his or its own authority, as reprisal and confiscation; 8 Ves.
429; the latter is that which is granted to a court or judicial tribunal.
So of controversies between states; they are in their nature political,
when the sovereign or state reserves to itself the right of deciding on
it; makes it the "subject of a treaty, to be settled as between states
independent," or "the foundation of representations from state to
state." This is political equity, to be adjudged by the parties them-
selves, as contradistinguished from judicial equity, administered by a
court of justice, decreeing the equum et bonum of the case, let who or
what be the parties before them. These are the definitions of law as
made in the great Maryland case of Barclay v. Russell, 3 Ves. 435,
as they have long been settled and established. Their correctness
will be tested by a reference to the question of original boundary,
as it ever has been, and yet is by the constitution of England; which
was ours before the revolution, while colonies; 8 Wheat. 588; as it
was here from 1771 to 1781, thence to 1788, and since by the con-
stitution as expounded by this Court.

If the question concerning the boundaries of contiguous pieces of
land, manors, lordships, or counties palatine, arises within the realm,
it was cognizable in the high court of chancery, in an appropriate
case; a mere question of title to any defined part, was cognizable only
by ejectment or real action in a court of law; which were in either
case judicial questions. 1 Ves. sen. 446–7. If between counts Pala-
tine, boundary involved not only the right of soil, but the highest
franchise known to the law of England, jura regalia, to the same ex-
tent as the king in right of the crown and royal jurisdiction. Pala-
tine jurisdiction was a qualified sovereignty, till abridged by the 24
H. 8. ch. 24, Seld. Tit. Hon. 380, 382, 638, 838; 1 Black. Com-
mentaries, 108–17; 7 Co. 19; Cro. El. 240; 4 D. C. D. 450, &c. The

count appointed the judges of courts of law and equity; the king's writs did not run into his county; writs were in his name, and indictments against his peace, Co. Inst. 204–18. Yet his jurisdiction, his royalties, and jura regalia, &c., existed or disappeared, according as a chancellor should decree as to boundary. Penn v. Baltimore, 1 Ves. sen. 448–9, &c. The king had no jurisdiction over boundary within the realm, without he had it in all his dominions, as the absolute owner of the territory, from whom all title and power must flow, 1 Bl. Com. 241; Co. Litt. 1; Hob. 322; 7 D. C. D. 76; Cowp. 205–11; 7 Co. 17, b., as the supreme legislator; save a limited power in parliament. He could make and unmake boundaries in any part of his dominions, except in proprietary provinces. He exercised this power by treaty, as in 1763, by limiting the colonies to the Mississippi, whose charters extended to the South sea: by proclamation, which was a supreme law, as in Florida and Georgia, 12 Wheat. 524; 1 Laws U. S. 443–51: by order in council, as between Massachusetts and New Hampshire, cited in the argument. But in all cases it was by his political power, which was competent to dismember royal, though it was not exercised on the chartered or proprietary provinces. M'Intosh v. Johnson, 8 Wheat. 580. In council, the king had no original judicial power, 1 Ves. sen. 447. He decided on appeals from the colonial courts, settled boundaries, in virtue of his prerogative, where there was no agreement; but if there is a disputed agreement, the king cannot decree on it, and therefore, the council remit it to be determined in another place, on the foot of the contract, 1 Ves. sen. 447. In virtue of his prerogative, where there was no agreement, 1 Ves. sen. 205, the king acts not as a judge, but as the sovereign acting by the advice of his counsel, the members whereof do not and cannot sit as judges. By the statute 20 E. 3, ch. 1, it is declared, that " the king hath delegated his whole judicial power to the judges, all matters of judicature according to the laws," 1 Ruff. 246; 4 Co. Inst. 70, 74: he had, therefore, none to exercise: and judges, though members of council, did not sit in judicature, but merely as his advisers.

The courts had no jurisdiction over the colonies, persons or property therein, except in two cases; colonies and provinces being corporations under letters patent, 3 Ves. 435, were amenable to the king in the king's bench, by quo warranto, which is a prerogative writ; and a scire facias, in chancery, to repeal the letters patent, which is a part of the statutory jurisdiction of that court in such cases, by

the court in chancery, also in virtue of the royal prerogative, by which the charter was made. But chancery could not act on boundaries in the royal or chartered colonies: it could act on lords proprietors of provinces, when they were in the realm, where they were subjects; though in their provinces they were sovereign, dependent only on the crown and the general supremacy of parliament. Acts of parliament did not bind them, unless extended to them expressly, or by necessary consequence, 2 Ves. sen. 351. They had all the powers of counts palatine, the absolute propriety of soil, and the powers of legislation; the only restraint upon them was by the powers reserved to the king by his letters patent, and allegiance to the crown in matters of prerogative, not granted. The power of parliament was, on the American principle of the revolution, confined to the regulation of "external commerce;" though by the English principle, it extended to all cases whatever. Yet sovereign as they were as to all things, except those relating to the powers of the king and parliament, chancery could and did act on agreements between them as to their boundaries, in the case of Penn v. Baltimore; though it could not have done so had they stood at arms' length; in which case the king in council could alone have decided the original boundary on an appeal, 1 Ves. sen. 446. Chancery also could and did decide on the title to the Isle of Man, which was a feudal kingdom: on a bill for discovery of title, relief as to rectories and tithes, which was a mere franchise, a plea to jurisdiction was overruled. Derby v. Athol, 1 Ves. sen. 202; S. P. Bishop of Sodor & Man v. E. Derby, 2 Ves. sen. 337, 356.

In each of these cases, objections to the jurisdiction were made similar to those made in this, but were overruled; and neither the authority or principles of either have been questioned: on the contrary, they have been recognised and adopted by all courts which follow the course of the law of England; yet each involved the same question as the present. In the first, the decree as to boundary settled by consequence the collateral and dependent questions of title, jurisdiction, and sovereignty, of and over the disputed territory; in the two last, on a suit for rectories and tithes, the title to a feudal kingdom was but a dependent matter, and was settled by deciding that the bishop had a right to the tithes he claimed. The same principle was settled in the case of the Nabob of the Carnatic v. The East India Company, though it is commonly referred to in favour of a contrary position.

[The State of Rhode Island v. The State of Massachusetts.]

On the original pleadings, the case was on a bill for an account founded on two agreements between the parties, in 1785 and 1787; The defendants plead their rights and privileges under their charter, with power to make peace and war within its limits; that the plaintiff was a sovereign prince; that the agreements stated in the bill were made with him in their respective capacities, one as an absolute, the other as a qualified sovereign; and that the matters therein contained related to peace and war, and the security and defence of their respective territorial possessions.

The plea was considered and overruled by the chancellor; thus exercising jurisdiction to that extent. 1 Ves. 371, 387. An answer was then put in, containing the same matter as the plea; adding that the agreements between the parties were treaties of a federal character, both being sovereigns; and that the agreement of 1787 was a final treaty; and, therefore, the subject matters thereof were cognizable by the law of nations not by a municipal court. The bill was dismissed on this ground: "It is a case of mutual treaty between persons acting, in that instance, as states independent of each other; and the circumstance that the East India Company are mere subjects with relation to this country, has nothing to do with that. That treaty was entered into with them as a neighbouring independent state, and is the same as if it was a treaty between two sovereigns; and consequently is not a subject of municipal private jurisdiction." It thus is manifest, that if the answer had been to the merits, there must have been a decree: the dismission resulted from the new matter added, as is evident from the opinion of the chancellor on the plea; and of lord commissioner Eyre on the answer, and his closing remarks, in which he declares; " that the case was considered wholly independent of the judgment on the plea, and was decided on the answer, which introduced matters showing that it was not mercantile in its nature, but political; and therefore the decision stood wholly clear of the judgment on the plea." 2 Ves. jr. 56, 60.

That a foreign sovereign may sue in an English court of law or equity, was settled in cases brought by the king of Spain, Hob. 113. That a foreign government may sue in chancery, by such agents as it authorizes to represent them, on whom a cross bill can be served, with such process as will compel them to do justice to the defendant, was decided in the Columbian Government v. Rothschild, 1 Sim. 104. These cases were recognised in The King of Spain v. Machado, by the house of lords; who held that a king had the same right to

sue as any other person, but that when he did sue in chancery, it was as any other suitor, who sought or submitted to its jurisdiction; that it could decide on the construction and validity of the treaties between France and the allied sovereigns of Europe in 1814; and on the validity of a private and separate treaty between France and Spain.

The case involved both questions; both were fully considered by the lords, in affirming the decree of the chancellor, overruling the demurrer, 4 Russell, 560; which assigned for cause that the plaintiff had not made out a case for any relief in a court of equity, for the reasons assigned in the argument: that a foreign sovereign could not sue in virtue of his prerogative rights; that an English court would not enforce these rights, accruing out of a treaty with France, which was inconsistent with the existing relations between each of those countries, (France and Spain,) and the king of England. 2 Bligh. P. C. new series, 31, 44, 46, 50, 60.

The court of king's bench also will consider the effect of the declaration of independence and treaty of peace, in an action on a bond. Folliott v. Ogden, 3 D & E. 730.

From this view of the law of England, the results are clear, that the settlement of boundaries by the king in council, is by his prerogative; which is political power acting on a political question between dependent corporations or proprietaries, in his dominions without the realm. When it is done in chancery, it is by its judicial power, in "judicature according to the law," and necessarily a judicial question, whether it relates to the boundary of provinces, according to an agreement between the owners, as Penn v. Baltimore; the title to a feudal kingdom, in a suit appropriate to equity, where the feudal king appears and pleads, as in the case of the Isle of Man; or on an agreement between a foreign sovereign and the East India Company, in their mere corporate capacity. But when the company assumed the character of a sovereign, assert the agreement to be a "federal treaty," between them and the plaintiff, as neighbouring sovereigns, each independent, and the subject matter to be peace and war, political in its nature, on which no municipal court can act by the law of nations, chancery has no jurisdiction but to dismiss the bill. Not because it is founded on a treaty, but because the defendant refused to submit it to judicial power: for, had the Company not made the objection, by their answer, the court must have proceeded as in The King of Spain v. Machado, and decreed on

[The State of Rhode Island v. The State of Massachusetts.]

the validity, as well as the construction of the treaties. The court, in one case, could not force a sovereign defendant to submit the merits of the case to their cognizance; but in the other, when he was plaintiff, and a subject was a defendant, who appeared and plead, the whole subject matter of the pleadings was decided by judicial power, as a judicial question; and such has been, and is the settled course of equity in England.

In the colonies, there was no judicial tribunal which could settle boundaries between them; for the court of one could not adjudicate on the rights of another, unless as a plaintiff. The only power to do it remained in the king, where there was no agreement; and in chancery, where there was one, and the parties appeared; so that the question was partly political and partly judicial, and so remained till the declaration of independence. Then the states, being independent, reserved to themselves the power of settling their own boundaries, which was necessarily a purely political matter, and so continued till 1781. Then the states delegated the whole power over controverted boundaries to congress, to appoint and its court to decide, as judges, and give a final sentence and judgment upon it, as a judicial question, settled by a specially appointed judicial power, as the substitute of the king in council, and the court of chancery in a proper case; before the one as a political, and the other as a judicial question.

Then came the constitution, which divided the power between the political and judicial departments, after incapacitating the states from settling their controversies upon any subject, by treaty, compact, or agreement; and completely reversed the long established course of the laws of England. Compacts and agreements were referred to the political, controversies to the judicial power. This presents this part of the case in a very simple and plain aspect. All the states have transferred the decision of their controversies to this Court; each had a right to demand of it the exercise of the power which they had made judicial by the confederation of 1781 and 1788; that we should do that which neither states or congress could do, settle the controversies between them. We should forget our high duty, to declare to litigant states that we had jurisdiction over judicial, but not the power to hear and determine political controversies: that boundary was of a political nature, and not a civil one; and dismiss the plaintiff's bill from our records, without even giving it judicial consideration. We should equally forget the dic-

tate of reason, the known rule drawn by fact and law; that from the nature of a controversy between kings or states, it cannot be judicial; that where they reserve to themselves the final decision, it is of necessity by their inherent political power; not that which has been delegated to the judges, as, matters of judicature, according to the law. These rules and principles have been adopted by this Court from a very early period.

In 1799, it was laid down, that though a state could not sue at law for an incorporeal right, as that of sovereignty and jurisdiction; there was no reason why a remedy could not be had in equity. That one state may file a bill against another, to be quieted as to the boundaries of disputed territory, and this Court might appoint commissioners to ascertain and report them; since it is monstrous to talk of existing rights, without correspondent remedies. 3 Dall. 413. In New Jersey v. Wilson, the only question in the case was, whether Wilson held certain lands exempt from taxation. 7 Cr. 164. In Cohens v. Virginia, the Court held, that the judicial power of the United States must be capable of deciding any judicial question growing out of the constitution and laws. That in one class of cases, " the character of the parties is every thing, the nature of the case nothing;" in the other, " the nature of the case is every thing, the character of the parties nothing." That the clause relating to cases in law or equity, arising under the constitution, laws, and treaties, makes no exception in terms, or regards "the condition of the party." If there be any exception, it is to be implied against the express words of the article. In the second class, " the jurisdiction depends entirely on the character of the parties," comprehending " controversies between two or more states." " If these be the parties, it is entirely unimportant what may be the subject of controversy. Be it what it may, these parties have a constitutional right to come into the courts of the Union." 6 Wh. 378, 384, 392-3.

In the following cases it will appear, that the course of the Court on the subject of boundary, has been in accordance with all the foregoing rules; let the question arise as it may, in a case in equity, or a case in law, of a civil or criminal nature; and whether it affects the rights of individuals, of states, or the United States, and depends on charters, laws, treaties, compacts, or cessions which relate to boundary. In Robinson v. Campbell, the suit involved the construction of the compact of boundary between Virginia and North Carolina, made in 1802; and turned on the question, whether the land in controversy

was always within the original limits of Tennessee; which the Court decided. 3 Wh. 213, 218, 224. The United States v. Bevan, was an indictment for murder; the questions certified for the opinion of this Court were: 1st, whether the place at which the offence was committed, was within the jurisdiction of Massachusetts; and 2d, whether it was committed within the jurisdiction of the circuit court of that district. It was considered and decided, as a question of boundary, 3 Wh. 339, 386, as before stated. In Burton v. Williams, the case involved a collision of interest between North Carolina, Tennessee, and the United States, under the cessions by the former to the two latter, in which this Court reviewed all the acts of congress and of the two states on the subject, and the motives of the parties, to ascertain whether the *casus fœderis* had ever arisen. The case also involved the construction of the compact between Tennessee and the United States, made in 1806. The Court use this language in relation to it: "The members of the American family possess ample means of defence under the constitution, which we hope ages to come will verify. But happily for our domestic harmony, the power of aggressive operation against each other is taken away." It is difficult to imagine what other means of defence existed in such a case, unless those which the Court adopted, by construing the acts recited, as the contracts of independent states, by those rules which regulate contracts relating to territory and boundary. 3 Wh. 529, 533, 538. In De La Croix v. Chamberlain, it was held, that "a question of disputed boundary between two sovereign, independent nations, is indeed more properly a subject for diplomatic discussion and of treaty, than of judicial investigation. If the United States and Spain had settled this dispute by treaty, before the United States extinguished the claim of Spain to the Floridas, the boundary fixed by such treaty would have concluded all parties." 12 Wh. 600. Accordingly, in Harcourt v. Gailliard, which arose on a British grant made in 1777, the Court decided the case by reference to the treaty of 1763, the acts of the king before the revolution, the effect of the declaration of independence and treaty of peace in 1783, in order to ascertain the original boundary between Florida and Georgia; on which the whole case turned. 12 Wh. 524. In Henderson v. Poindexter, the same point arose, and the same course was taken; the treaty of boundary with Spain in 1795, was also considered by the Court, as well as the cession by Georgia to the United States in 1802, and the various acts of congress on the

subject. 12 Wh. 530, 534, &c. In Patterson v. Jenckes, the title
depended on the boundary between Georgia and the Cherokees; and
the only question was, as to the territorial limits of the state, accord-
ing to the treaties with them and that state, which the Court defined,
and decided accordingly. 2 Peters, 225–7, &c. So they had pre-
viously done in various cases, arising on the boundary between
North Carolina and the Cherokees. 1 Wh. 155; 2 Wh. 25; 9 Wh.
673; 11 Wh. 380. In Foster & Elam v. Neilson, two questions
arose: 1. On the boundary of the treaty of 1803, ceding Louisiana
to the United States, as it was before the cession of the Floridas by
Spain, by the treaty of 1819: 2d. The construction of the eighth
article of that treaty. Both claimed the territory lying north of a
line drawn east from the Iberville, and extending from the Missis-
sippi to the Perdido. The title to the land claimed by the parties,
depended on the right of Spain to grant lands within the disputed
territory; at the date of the Spanish grant to the plaintiff, in 1804.
He claimed under it, as being then within the territory of Spain;
and confirmed absolutely by the treaty of cession: the defendant
rested on his possession. On the first question, the Court held, that
so long as the United States contested the boundary, it was to be
settled by the two governments, and not by the Court; but if the
boundary had been settled between France while she held Louisiana,
and Spain while she held Florida, or the United States and Spain
had agreed on the boundary after 1803; then the Court could decide
it as a matter bearing directly on the title of the plaintiff. On the
second question, they held, that as the government had up to that
time construed the eighth article of the treaty of 1819, to be a mere
stipulation for the future confirmation of previous grants by Spain,
to be made by some legislative act, and not a present confirmation,
absolute and final by the mere force of the treaty itself, as a supreme
law of the land, the Court was bound not to give a different con-
struction. On that construction, the question was, by whom the con-
firmation should be made: the Court held the words of the treaty to
be the language of contract, to be executed by an act of the legisla-
ture, of course by political power; to be exercised by the congress at
its discretion; on which the Court could not act. But the Court
distinctly recognised the distinction between an executory treaty, as
a mere contract between nations, to be carried into execution by the
sovereign power of the respective parties, and an executed treaty,
effecting of itself the object to be accomplished, and defined the line

between them thus: "Our constitution declares a treaty to be the law of the land. It is consequently to be regarded in courts of justice, as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision. But when the terms of the stipulation import a contract; when either of the parties stipulate to perform a particular act; the treaty addresses itself to the political, not to the judicial department; and the legislature must execute the contract, before it can become a rule for the Court." Adopting the construction given by congress, and the boundary being disputed in 1804, when the grant was made, the Court considered both to be political questions; and held them not to be cognizable by judicial power. 2 Peters, 253, 299, 306, 309, 314, 315. All the principles laid down in this case, were fully considered and affirmed in the United States v. Arredondo; which arose under an act of congress, submitting to this Court the final decision of controversies between the United States and all persons claiming lands in Florida, under grants, &c. by Spain, and prescribing the rules for its decision, among which was the "stipulations of any treaty," &c. Thus acting under the authority delegated by congress, the Court held that the construction of the eighth article of the treaty of 1819, by its submission to judicial power, became a judicial question; and on the fullest consideration, held, that it operated as a perfect, present, and absolute confirmation of all the grants which come within its provision. That no act of the political department remained to be done; that it was an executed treaty, the law of the land, and a rule for the Court. 6 Peters, 710, 735, 741, 742, 743. In the United States v. Percheman, the Court, on considering the necessary effect of this construction, repudiated that which had been given in Foster & Elam v. Neilson; 7 Peters, 89. In the numerous cases which have arisen since, the treaty has been taken to be an executed one, a rule of title and property, and all questions arising under it to be judicial; and congress has confirmed the action of the Court whenever necessary. In New Jersey v. New York, the Court were unanimous in considering the disputed boundary between these states, to be within their original jurisdiction, and reaffirming the jurisdiction of the circuit courts, in cases between parties claiming lands under grants from different states: the only difference of opinion was on one point, suggested by one of the judges, whether, as New York had not appeared, the Court could award compulsory process, or proceed ex parte; a point which does not arise in this cause, and need

[The State of Rhode Island v. The State of Massachusetts.]

not to be considered in its present stage; as Massachusetts has appeared and plead to the merits of the bill.

If judicial authority is competent to settle what is the line between judicial and political power and questions, it appears from this view of the law, as administered in England and the courts of the United States, to have been done without any one decision to the contrary, from the time of Edward the Third. The statute referred to, operated like our constitution to make all questions judicial, which were submitted to judicial power, by the parliament of England, the people or legislature of these states, or congress; and when this has been done by the constitution, in reference to disputed boundaries, it will be a dead letter if we did not exercise it now, as this Court has done in the cases referred to.

The course of the argument made it necessary for the Court to pursue that which has been taken. Having disposed of the leading objection to jurisdiction, we will examine the others.

It has been argued by the defendant's counsel, that by the declaration of independence, Massachusetts became a sovereign state over all the territory in her possession, which she claimed by charter or agreement; in the enjoyment of which she cannot be disturbed.

To this objection there are two obvious answers: 1st. By the third article of confederation, the states entered into a mutual league for the defence of their sovereignty, their mutual and general welfare; being thus allies in the war of the revolution, a settled principle of the law of nations, as laid down by this Court, prevented one from making any acquisition at the expense of the other. 12 Wh. 525–6. This alliance continued, in war and peace, till 1788; when, 2d: Massachusetts surrendered the right to judge of her own boundary, and submitted the power of deciding a controversy concerning it to this Court. 6 Wh. 378, 380, 393.

It is said, that the people inhabiting the disputed territory, ought to be made parties, as their rights are affected. It might with the same reason be objected, that a treaty or compact settling boundary, required the assent of the people to make it valid, and that a decree under the ninth article of confederation was void; as the authority to make it was derived from the legislative power only. The same objection was overruled in Penn v. Baltimore; and in Poole v. Fleeger; this Court declared, that an agreement between states, consented to by congress, bound the citizens of each state. There are two principles of the law of nations, which would protect them in

their property : 1st. That grants by a government, de facto, of parts of a disputed territory in its possession, are valid against the state which had the right. 12 Wh. 600–1. 2d. That when a territory is acquired by treaty, cession; or even conquest, the rights of the inhabitants to property, are respected, and sacred. 8 Wh. 589; 12 Wh. 535; 6 Peters, 712; 7 Peters, 867; 8 Peters, 445; 9 Peters, 133; 10 Peters, 330, 718, &c.

It has been contended, that this Court cannot proceed in this cause, without some process and rule of decision prescribed appropriate to the case; but no question on process can arise on these pleadings; none is now necessary, as the defendant has appeared, and plead, which plea in itself makes the first point in the cause, without any additional proceeding; that is, whether the plea shall be allowed if sufficient in law to bar the complaint, or, be overruled, as not being a bar in law, though true in fact. In this state of the case, it is that of the Nabob v. The East India Company, where the plea was overruled on that ground, whereby the defendant was put to an answer, assigning additional grounds, to sustain a motion to dismiss; or if, the plea is allowed, the defendant must next prove the truth of the matters set up. When that is done, the Court must decide according to the law of equity, 1 Ves. sen. 446, 203, whether the agreement plead shall settle, or leave the boundary open to a settlement by our judgment, according to the law of nations, the charters from the crown under which both parties claim, as in 5 Wheat. 375; by the law of prescription, as claimed by the defendant, on the same principles which have been rules for the action of this Court in the case 1 Ves. sen. 453; 9 Peters, 760.

It is further objected, that though the Court may render, they cannot execute a decree without an act of congress in aid.

In testing this objection by the common law, there can be no difficulty in decreeing, as in Penn v. Baltimore; mutatis mutandis. That the agreement is valid, and binding between the parties; appointing commissioners to ascertain and mark the line therein designated; order their proceedings to be returned to the Court; 3 Dall. 412, note; decree that the parties should quietly hold according to the articles; that the citizens on each side of the line should be bound thereby, so far and no farther than the states could bind them by a compact, with the assent of congress, (11 Peters 209;) 1 Ves. sen. 455; 3 Ves. sen., supplement by Belt. 195, 197. Or if any difficulty should occur, do as declared in 1 Ves. sen.; if the parties want

any thing more to be done, they must resort to another jurisdiction, which is appropriate to the cause of complaint, as the king's bench, or the king in council. Vide United States v. Peters, 5 Cranch, 115, 135, case of Olmstead; make the decree without prejudice to the (United States,) or any persons whom the parties could not bind. And in case any person should obstruct the execution of the agreement, the party to be at liberty, from time to time, to apply to the Court. 1 Ves. jr. 454; 3 Ves. sen. 195, 196. Or, as the only question is one of jurisdiction, which the Court will not divide, they will retain the bill, and direct the parties to a forum proper to decide collateral questions. 1 Ves. sen. 204, 205; 2 Ves. sen. 356, 357; 1 Ves. sen. 454; 5 Cranch, 115, 136. On the other hand, should the agreement not be held binding, the Court will decree the boundary to be ascertained agreeably to the charters, according to the altered circumstances of the case; by which the boundary being established, the rights of the parties will be adjudicated, and the party in whom it is adjudged may enforce it by the process appropriate to the case; civilly or criminally, according to the laws of the state, in which the act which violates the right is committed. In ordinary cases of boundary, the functions of a court of equity consist in settling it by a final decree, defining and confirming it when run. Exceptions, as they arise, must be acted on according to the circumstances.

In England, right will be administered to a subject against the king, as a matter of grace; but not upon compulsion, not by writ, but petition to the chancellor, 1 Bl. Com. 243; for no writ or process can issue against the king, for the plain reason given in 4 Co. 55, a.; 7 Com. Dig., by Day, 83; Prerog. D. 78; 3 Bl. Com. 255; "that the king cannot command himself." No execution goes out on a judgment or decree against him, on a monstrans de droit or petition of right, or traverse of an inquisition which had been taken in his favour; for this reason, that as the law gives him a prerogative for the benefit of his subjects, 1 Bl. Com. 255, he is presumed never to do a wrong, or refuse a right to a subject; he is presumed to have done the thing decreed, by decreeing in his courts that it shall be done; such decree is executed by the law as soon as it is rendered; and though process is made out to make the record complete, it is never taken from the office. Co. Ent. 196; 9 Co. 98, a.; 7 D. C. D. 83. The party in whose favour a decree is made, for removing the lands of the king from the possession of a subject, or declaring a seizure unlawful and awarding a writ, de libertate, is, eo instanti, deemed to be in actual

[The State of Rhode Island v. The State of Massachusetts.]

possession thereof; so that a feoffment, with livery of seisin, made before it is actually taken, is as valid as if made afterwards. Cro. El. 523; S. P. 463.

The same principle was adopted by the eminent jurists of the revolution, in the ninth article of the confederation, declaring that the sentence of the Court in the cases provided for, should be final and conclusive, and with the other proceedings in the case, be transmitted to congress, and lodged among their acts, for the security of the parties concerned, nothing further being deemed necessary. The adoption of this principle, was indeed a necessary effect of the revolution, which devolved on each state the prerogative of the king as he had held it in the colonies; 4 Wheat. 651; 8 Wheat. 584, 588; and now holds it within the realm of England; subject to the presumptions attached to it by the common law, which gave, and by which it must be exercised. This Court cannot presume, that any state which holds prerogative rights for the good of its citizens, and by the constitution has agreed that those of any other state shall enjoy rights, privileges, and immunities in each, as its own do, would either do wrong, or deny right to a sister state or its citizens, or refuse to submit to those decrees of this Court, rendered pursuant to its own delegated authority; when in a monarchy its fundamental law declares that such decree executes itself. When, too, the nighest courts of a kingdom have most solemnly declared that when the king is a trustee, a court of chancery will enforce the execution of a trust by a royal trustee; 1 Ves. sen. 453; and that when a foreign king is a plaintiff, in a court of equity, it can do complete justice; impose any terms it thinks proper; has him in its power, and completely under its control and jurisdiction; 2 Bligh. P. C. 57; we ought not to doubt as to the course of a state of this Union; as a contrary one would endanger its peace, if not its existence. In the case of Olmstead, this Court expressed its opinion that if state legislatures may annul the judgments of the courts of the United States, and the rights thereby acquired, the constitution becomes a solemn mockery, and the nation is deprived of the means of enforcing its laws, by its own tribunal. So fatal a result must be deprecated by all; and the people of every state must feel a deep interest in resisting principles so destructive of the Union, and in averting consequences so fatal to themselves. 5 Peters 115, 135.

The motion of the defendant is, therefore, overruled.

[The State of Rhode Island v. The State of Massachusetts.]

Mr. Chief Justice TANEY, dissenting:

I dissent from the opinion of the Court, upon the motion to dismiss the bill. It has, I find, been the uniform practice in this Court, for the justices who differed from the Court on constitutional questions, to express their dissent. In conformity to this usage, I proceed to state briefly the principle on which I differ, but do not, in this stage of the proceedings, think it necessary to enter fully into the reasoning upon which my opinion is founded. The final hearing of the case, when all the facts are before the Court, would be a more fit occasion for examining various points stated in the opinion of the Court; in which I do not concur.

I do not doubt the power of this Court to hear and determine a controversy between states, or between individuals, in relation to the boundaries of the states, where the suit is brought to try a right of property in the soil, or any other right which is properly the subject of judicial cognizance and decision, and which depends upon the true boundary line.

But the powers given to the courts of the United States by the constitution are judicial powers; and extend to those subjects, only, which are judicial in their character; and not to those which are political. And whether the suit is between states or between individuals, the matter sued for must be one which is properly the subject of judicial cognizance and control, in order to give jurisdiction to the Court to try and decide the rights of the parties to the suit.

The object of the bill filed by Rhode Island, as stated in the prayer, is as follows: That the northern boundary line between your complainants and the state of Massachusetts may, by the order and decree of this honourable Court, be ascertained and established, and that the rights of jurisdiction and sovereignty of your complainants to the whole tract of land, with the appurtenances mentioned, described, and granted, in and by the said charter or letters patent to the said colony of Rhode Island and Providence Plantations, hereinbefore set forth and running on the north, an east and west line drawn three miles south of the waters of said Charles river, or of any or every part thereof, may be restored and confirmed to your complainants, and your complainants may be quieted in the full and free enjoyment of her jurisdiction and sovereignty over the same; and the title, jurisdiction, and sovereignty of the said state of Rhode Island, and Providence Plantations over the same, be confirmed and established by the decree of this honourable Court; and that your com-

plainants may have such other and further relief in the premises as to this honourable Court shall seem meet, and consistent with equity and good conscience.

It appears from this statement of the object of the bill, that Rhode Island claims no right of property in the soil of the territory in controversy. The title to the land is not in dispute between her and Massachusetts. The subject matter which Rhode Island seeks to recover from Massachusetts, in this suit, is, " sovereignty and jurisdiction," up to the boundary line described in her bill. And she desires to establish this line as the true boundary between the states, for the purpose of showing that she is entitled to recover from Massachusetts the sovereignty and jurisdiction which Massachusetts now holds over the territory in question. Sovereignty and jurisdiction are not matters of property; for the allegiance in the disputed territory cannot be a matter of property. Rhode Island, therefore, sues for political rights. They are the only matters in controversy, and the only things to be recovered; and if she succeeds in this suit, she will recover political rights over the territory in question, which are now withheld from her by Massachusetts.

Contests for rights of sovereignty and jurisdiction between states over any particular territory, are not, in my judgment, the subjects of judicial cognizance and control, to be recovered and enforced in an ordinary suit; and are, therefore, not within the grant of judicial power contained in the constitution.

In the case of New York v. Connecticut, 4 Dallas, 4, in the note, Chief Justice Ellsworth says, " To have the benefit of the agreement between the states, the defendants below, who are the settlers of New York, must apply to a court of equity, as well as the state herself; but in no case can a specific performance be decreed, unless there is a substantial right of soil, not a mere right of political jurisdiction, to be protected and enforced."

In the case of The Cherokee Nation v. The State of Georgia, 5 Peters, 20, Chief Justice Marshall, in delivering the opinion of the Court, said: "That part of the bill which respects the land occupied by the Indians, and prays the aid of the Court to protect their possession, may be more doubtful. The mere question of right might, perhaps, be decided by this Court, in a proper case, with proper parties. But the Court is asked to do more than decide on the title. The bill requires us to control the legislation of Georgia, and to restrain the exertion of its physical force. The propriety of such an

interposition by the Court may be well questioned. It savours too much of the exercise of political power to be within the proper province of the judicial department. But the opinion on the point respecting parties makes it unnecessary to decide this question."

In the case before the Court, we are called on to protect and enforce the "mere political jurisdiction" of Rhode Island; and the bill of the complainant, in effect, asks us to "control the legislature of Massachusetts, and to restrain the exercise of its physical force" within the disputed territory. According to the opinions above referred to, these questions do not belong to the judicial department. This construction of the constitution is, in my judgment, the true one; and I therefore think the proceedings in this case ought to be dismissed for want of jurisdiction.

Mr. Justice BARBOUR said, that he concurred in the result of the opinion in this case. That this Court had jurisdiction to settle the disputed boundary between the two states, litigant before it. But he wished to be understood, as not adopting all the reasoning by which the Court had arrived at its conclusion.

Mr. Justice STORY did not sit in this case.

On consideration of the motion made by Mr. Webster on a prior day of the present term of this Court, to wit, on Monday the 15th day of January, A. D. 1838, to dismiss the complainant's bill filed in this case for want of jurisdiction, and of the arguments of counsel thereupon had, as well in support of, as against the said motion: It is now here ordered and adjudged, by this Court, that the said motion be, and the same is hereby overruled.